**Robert H. MILLER, Regional Director of Region 20 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**HOTEL AND RESTAURANT EMPLOYEES AND BARTENDERS UNION, LOCAL 2, Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO, Respondents.**

No. C84–6382 TEH.

United States District Court, N.D. California.

May 24, 1985.

On Amount of Attorney Fees Oct. 1, 1985.

Walter L. Kintz, Alan D. Longman, Joseph P. Norelli, N.L.R.B., Region 20, San Francisco, Cal., for petitioner.

Matthew D. Ross, Neyhart, Anderson, Nussbaum, Reilly & Freitas, San Francisco, Cal., for respondents.

## ORDER

THELTON E. HENDERSON, District Judge.

## I.  BACKGROUND

This case represents one chapter in a lengthy strike by members of the Hotel and Restaurant Employees and Bartenders Union, Local 2 (hereinafter "union" or "respondent") against several San Francisco area restaurants in the fall of 1984. In particular, this action arises out of the union's strike against Scoma's restaurant which began on September 1, after contract negotiations proved unsuccessful.

When the strike began, the union did not limit its picketing to the area directly in front of the entrance to Scoma's restaurant, which is located at the end of Pier 47 in the Fisherman's Wharf area and some 400 feet from the intersection of the Pier and the street. Rather, pickets, which at all times indicated the dispute was with Scoma's, were also placed at various points along the Pier and where the Pier intersected the street. In response, Scoma's restaurant filed an unfair labor practice charge with the National Labor Relations Board (hereinafter "Board") on September 10, 1984 (case No. 20–CC–2792), alleging that the union was engaging in secondary picketing in violation of Section 8(b)(4)(i)(ii)(B) of the National Labor Relations Act (hereinafter "NLRA"). Although the Board initially declined to issue a complaint in response to the charge, it eventually did so on September 25, 1984. Then, on September 27, 1984, the Board, pursuant to § 10(l) of the NLRA, filed the instant petition for preliminary injunctive relief pending a full Board hearing on the complaint, scheduled for January of 1985.

Essentially, the petition asserted that the Board had reasonable cause to believe that the union, by picketing at the locations described above, had an illegal objective of forcing other neutral businesses on the Pier to cease doing business with Scoma's or of preventing others from doing business with the neutral businesses located along the Pier. On October 15, 1984, the Court heard oral argument in the matter and denied the Board's petition on the grounds that it had not met its burden of establishing reasonable cause to believe the union harbored the proscribed objectives (See Findings of Fact and Conclusions of Law, filed January 3, 1985, 605 F.Supp. 573 (N.D.Cal.1985) (hereinafter "Findings & Conclusions").

Subsequently, the union filed the instant motion for attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d) which provides that eligible parties who prevail against the government shall be awarded fees and expenses unless the government's position was substantially justified or special circumstances would make an award unjust. Petitioner opposes the motion on the grounds that the

union is not an eligible party, and that even should it be found eligible, an award is precluded because the position of the United States was substantially justified. After carefully considering the entire record in this matter, including the thorough briefing by both sides, we hereby grant in part, and deny in part, respondent's motion for the reasons set forth below:

## II. ELIGIBILITY

In enacting the Equal Access to Justice Act (hereinafter "EAJA" or "Act") Congress sought to minimize the economic deterrent against seeking review of, or defending against, unreasonable governmental action.[1] To this end, Congress expressly limited the Act's coverage to those parties it determined might otherwise be discouraged from vindicating their rights against the government for financial reasons. Specifically, it limited eligibility to

(i) an individual whose net worth did not exceed $1,000,000 at the time the civil action was filed, (ii) a sole owner of an unincorporated business, or a partnership, corporation, association or organization whose net worth did not exceed $5,000,000 at the time the civil action was filed, except that an organization described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3) exempt from taxation under section 501(a) of the Code and a cooperative association as defined in section 15(a) of the Agricultural Marketing Act (12 U.S.C. 1141j(a), may be a party regard-

less of the net worth of such organization or cooperative association, *or* (iii) a sole owner of an unincorporated business, or a partnership, corporation, association, or organization having not more than 500 employees at the time the civil action was filed; 28 U.S.C. § 2412(d)(2)(B) (emphasis added).

It is uncontested that Respondent's net worth does not exceed five million dollars and that its employees number less than five hundred. However, the Board contends that since Respondent is affiliated with the Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO, its assets and employees should be aggregated with the assets and employees of the International Union for the purposes of determining eligibility.

Since the International has over five million dollars in assets, but employs less than 500 persons, under a literal reading of the statute, respondent would nevertheless remain eligible for fees, even if aggregated with its International. The Board, however, urges us to further interpret the Act so as to require eligible parties to have less than 500 employees *and* less than five million dollars in assets on the grounds that such a reading is more consistent with the legislative history of the Act.[2] As Petitioner points out, there is support in the legislative history for the position that Congress intended to exclude from eligibility those entities whose net worth exceeds five million *or* who have more than 500 employees.[3]

---

**1.** In addition to providing direct financial relief to eligible parties, Congress also hoped the EAJA would encourage agencies to carefully evaluate claims and only pursue those which are not weak or tenuous. Congress further hoped that the EAJA would serve to refine public policy by encouraging "greater precision, efficiency and fairness in the interpretation of statutes and in the formulation and enforcement of government regulations." *Spencer v. Nat'l Labor Relations Bd.,* 712 F.2d 539, 550 (D.C.1983); H.R.Rep. No. 1418, 96th Cong.2d Sess. 9, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4984.

**2.** Petitioner also relies on the Administrative Conference of the United States' suggested rules for implementation of the EAJA, promulgated

primarily to promote uniformity of procedure among agencies. These suggested rules are not binding on the agencies, much less the courts, and we do not find that rule 0.104(f), which calls for aggregation of an applicant and its affiliates, based on a corporate model, a persuasive indication of Congress' intent with respect to the eligibility issue presented in this case.

**3.** *See e.g.,* H.R.Rep. No. 1434, 96th Cong., 2d Sess. 22, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5003, 5011, 5015, indicating that Congress intended to define eligible parties for purposes of judicial proceedings the same as it defined eligible parties for purposes of administrative proceedings. Under EAJA's comparable provision for administrative proceedings, eligi-

We need not reach, however, the latter issue of whether the employee and asset requirements of § 2412(d) should be read in the disjunctive or conjunctive because we would find that Respondent is an eligible party under either construction. If a literal interpretation is followed, it is unnecessary to reach the issue of aggregation. Since the International employs less than 500 persons, Respondent is eligible regardless of whether it is aggregated with the International.

■ If, on the other hand, the Act requires Respondent to satisfy both the employee and asset requirements, we conclude that a local's eligibility should be determined without reference to its National, International or other similar affiliation. In construing a statute, the Court's objective is to carry out the intent of Congress. *Philbrook v. Glodgett*, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975); *Hughes Air Corp. v. Pub. Utilities Comm'n*, 644 F.2d 1334, 1337 (9th Cir. 1981). Here, the EAJA and its legislative history is silent as to the specific question of aggregation of labor. However, it is clear that Congress intended unions to be encompassed by the Act. Section 202 of the EAJA provides that:

"(a) The Congress finds that certain individuals, partnerships, corporations, and *labor* and other organizations may be deterred from seeking review of, or defending against, unreasonable govern-

mental action because of the expense involved in securing the vindication of their rights incivil actions and in administrative proceedings.
(b) The Congress further finds that because of the greater resources and expertise of the United States the standard for an award of fees against the United States should be different from the standard governing an award against a private litigant, in certain situations.
(c) It is the purpose of this title—
(1) to diminish the deterrent effect of seeking review of, or defending against, governmental action by providing in specified situations an award of attorney fees, expert witness fees, and other costs against the United States; ..." [Emphasis added]

There are also specific references in the Congressional Record to the "tight budgets" that labor unions "normally operate on" (*see* 125 *Cong.Rec.* 21442 (1979), Statement of Sen. McClure), and to the fact that labor unions are often forced to litigate against the United States as a matter of necessity. (*See* 125 *Cong.Rec.* 21441 (1979), Statement of Sen. McClure).

■ It is also clear that the vast majority of unions are affiliated or connected in some manner to a national or international union. Indeed, unaffiliated unions are almost an anomaly, representing only a small fraction of the total union membership in the United States.[4] In addition, the

---

ble parties are defined to exclude entities whose net worth exceeds five million dollars as well as entities who employ over 500 persons. 5 U.S.C. § 504(b)(1)(B)(i), (ii). Guided by this legislative history, the fourth circuit, in *NLRB v. Para-Chem Southern*, 711 F.2d 1051 (4th Cir.1983), determined that an applicant must meet both the employee number and the net worth requirements to be eligible to recover under section 2412(d)(2)(B).

However, as was noted in *Hoopa Valley Tribe v. Watt*, 569 F.Supp. 943, 946 (N.D.Cal.1983), since the language of § 2412(d)(2)(B) is unambiguous on its face, it is not the court's function to look beyond the literal language absent compelling circumstances. *See also Tulalip Tribes of Washington v. Federal Energy Regulatory Commission*, 732 F.2d 1451, 1454 (9th Cir.1984) ("Although a court is not absolutely forbidden from considering the legislative history when

construing a statute which is plain on its face ... it is 'a step to be taken cautiously'.") (citing *Rivera v. Becerra*, 714 F.2d 887, 893 (9th Cir. 1983), *cert. denied, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Donovan*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 124 (1984). Resolution of this issue of statutory construction is, however, unnecessary given our conclusion that we would find respondent eligible under either construction of the EAJA. *See* Discussion, *infra*.

**4.** According to the *Directory of National Unions and Employee Associations*, 1979, U.S. Dept. of Labor, Bureau of Labor Statistics, 1980 (Bulletin 2079), at 4, local, independent unions represented approximately 1.6 percent of the total 1978 union membership of the United States. In all likelihood, Congress was cognizant of this basic structural character of the American labor unions when EAJA was passed. The Court

national or internationals with whom the overwhelming number of union members are affiliated, report assets of over five million dollars.[5] Thus, were we to accept petitioner's invitation to require aggregation, the vast majority of local unions would be excluded from recovering under the Act. We cannot conclude that Congress contemplated such a result, when it would virtually render its inclusion of the term "labor" in section 202 surplusage. *See, United States v. Marubeni America Corp.,* 611 F.2d 763, 767 (9th Cir.1980) ("The rule is well established that statutes should not be construed to make surplusage of any provision.").

Moreover, well established principles and practical reality comport with this result. Not only have Courts and the Board long held that a local and its International are two distinct legal entities,[6] but the local has no guarantee that an International will finance its legal expenses or that it can enjoy the use of the International's assets and employees.[7] Thus, while an International may exceed the eligibility requirements of § 2412(d), this does not warrant the assumption that its local affiliate has sufficient resources at its disposal to justify treating it as the equivalent of an entity with over five million dollars in assets or over five hundred employees.[8]

## III. SUBSTANTIAL JUSTIFICATION OF THE BOARD'S POSITION

As an eligible, prevailing party, Respondent is entitled to an award of attorney fees and costs, unless the position of the United States was substantially justified. 28 U.S.C. § 2412(d)(1)(A).

In construing the term "position of the United States," courts have found support for two different interpretations in the legislative history and the Act itself. Some courts have concluded that these sources suggest that Congress intended an examination of the "underlying governmental action" that precipitated the lawsuit, *see, e.g., Natural Resources Defense Council v. U.S. Environmental Protection Agency,* 703 F.2d 700, (3rd Cir.1983), while others have determined that a focus on the government's position during litigation is more appropriate, *see, e.g., Spencer v. National Labor Relations Board,* 712 F.2d 539, 546–552 (D.C.1983). The Ninth Circuit has adopted neither the "underlying action" nor the "litigation position" theory exclusively. Rather, it has determined that the existence of support for both approaches "supports the view that Congress intended to include both the underlying action and the government's litigation pos-

---

notes that Congress was certainly aware of the institutional structure of union when it enacted the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401, *et. seq.,* which explicitly recognizes the distinctions between local, intermediate, and national/international organizations, and in part, concerns the use of trusteeship powers by international unions over locals. *See* 29 U.S.C. §§ 461–66.

**5.** As of 1983, 15,598,000, out of a total of 18,-634,000, (or 83.7% of) labor union members in the United States were connected or affiliated with unions reporting assets of five million dollars or more. *Data reported in* LEO TROY & NEIL SHEFLIN, UNION SOURCE BOOK (1985).

**6.** *See e.g., International Brotherhood of Electrical Workers, AFL–CIO, et al.,* 121 NLRB 143, 146–149 (1958) ("The overwhelming weight of judicial authority ... is that a local union is a legal entity apart from its international and that it is not a mere branch or arm of the latter.

That too has been the position of the Board."); *see also, Carbon Fuel Co. v. United Mine Workers,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979); *Shimman v. Frank,* 625 F.2d 80, 94–99 (6th Cir.1980). *See also* Second Declaration of S. Chiesa (Secretary-Treasurer of Local 2), filed January 14, 1985 at 2–3.

**7.** The declarations before this Court indicate that respondent is solely responsible for its litigation expenses and has not received financial assistance in this regard from its International except for a period between October 1978 and spring of 1979 when respondent was under a trusteeship by the International. *See* Declaration of H. Leavitt (General Secretary-Treasurer of the Hotel and Restaurant Employees International Union, AFL–CIO), filed January 14, 1985; Second declaration of S. Chiesa, *supra.*

**8.** The foregoing discussion is, of course, limited to the labor union context. We need not and do not address the issue of aggregation of corporate or other non-union entities.

ture within the term position.... It is our opinion that the remedial purpose of the EAJA is best served by considering the totality of the circumstances prelitigation and during trial." *Rawlings v. Heckler,* 725 F.2d 1192, 1195–96 (9th Cir.1984); *Timms v. U.S.,* 742 F.2d 489, 492 (9th Cir. 1984). Accordingly, we find it appropriate to examine the government's action that precipitated the litigation, namely the issuance of the complaint, as well as its position subsequent to issuance and up to the time of the hearing on the preliminary injunction.[9]

■ With respect to the term "substantial justification," the courts agree that the applicable standard is essentially one of reasonableness, i.e., whether the government's case had a reasonable basis in law and fact. *Rawlings, supra,* 725 F.2d at 1196; *Foster v. Tourtellotte,* 704 F.2d 1109, 1112 (9th Cir.1983) (quoting H.R.Rep. No. 1418, 96th Cong.2d Sess. 10–11, *reprinted in* 1980 U.S.Code Cong. & Ad. News, 4984, 4989–90). However, some courts have noted that because the Senate Judiciary Committee decided against changing the language from "substantially justified" to "reasonably justified," that "it can be concluded that the applicable standard ... is slightly above one based on reasonableness." *Ulrich v. Schweiker,* 548 F.Supp. 63, 65 (D.Idaho 1982); *Nunes-Cooreia v. Haig,* 543 F.Supp. 812, 817 (D.C. 1982); *see also, National Resources Defense Counsel v. EPA, supra,* 703 F.2d at 721 n. 7 (Hunter, J., dissenting).

9. As noted earlier, the issuance of the complaint is the agency action that precipitated this litigation, given that the Board is under a mandatory duty to seek injunctive relief pursuant to section 10($\tilde{l}$) of the Act once a complaint is issued. *See also,* 29 C.F.R. § 101.37 (1984). However, the Board is not under a similar mandatory duty to maintain a complaint once issued. Rather, the Regional Director retains the discretion to withdraw the complaint, on his or her own motion given that section 3(d) of the Labor Management Relations Act, as amended, 29 U.S.C. § 153(d), vests in the General Counsel the "final authority" for both the issuance and the prosecution of complaints. *International Association of Machinists and Aerospace Workers, AFL–CIO v. Lubbers,* 681 F.2d 598, 604–05 (9th Cir.1982);

■ It is the government's burden to establish substantial justification, *Timms, supra,* 742 F.2d at 492; *Spencer, supra,* 712 F.2d at 557. However, this standard "should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing." H.Rep. No. 1418, *supra,* at 11.

### Issuance of the Complaint

Before discussing the Board's action with respect to issuing the complaint, it is helpful to briefly review the pertinent statutory scheme. Once a party charges that § 158(b)(4) of 29 U.S.C. is being violated, a preliminary investigation is made forthwith. 29 U.S.C. § 160(*l*).

If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition [the proper] United States District Court for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. *Id.*

According to the relevant regulations, a complaint should issue "[if] the charge appears to have merit and efforts to dispose of it by informal adjustment are unsuccessful ..." 29 C.F.R. § 101.8 (1984).

*see also, George Banta Co., Inc. v. NLRB,* 626 F.2d 354, 356 (4th Cir.1980); *Local 282, Teamsters v. NLRB,* 339 F.2d 795, 799 (2nd Cir.1964). The Board's internal regulations reflect its ultimate authority in this matter. Section 10275.1 of the NLRB Case Handling Manual, Part I, states that:

Upon a prehearing discovery of lack of merit, if the charging party will not withdraw its charge, the complaint should be withdrawn by an order which includes a dismissal of the charge and instructions for appealing the action.

Thus, we conclude that the statutory scheme does not require us to end our inquiry once the complaint is issued.

■ While a decision to issue a complaint clearly does not involve a final judgment on the substance of the charges, it does trigger a mandatory petition for injunctive relief and requires the respondent to answer and defend the complaint. Thus, the Boards' action of determining that a complaint has "merit," and issuing the complaint, is only substantially justified if the Board at least has a reasonable basis in law and fact for believing that respondent was picketing with an objective of violating the relevant provisions of the Act.

■ At the time the instant complaint was issued, the Board had in its possession, *inter alia,* the following evidence: 1) that pickets were located at various points along the Pier and at the intersection of the Pier and Jefferson Street, away from the immediate entrance to Scoma's; 2) affidavits from Capurro, owner of Capurro's restaurant located at the above intersection, stating, *inter alia,* that pickets were attempting to block movement onto the Pier generally, that pickets were blocking a side entrance to his restaurant, that pickets were crossing in front of his restaurant on their way to visit fellow pickets at another struck restaurant, Pompeii's Grotto, and that his business had declined 25–50% as a result of the strike; 3) affidavits from Svedise, owner of United Shell Fish, located on the Pier, stating, *inter alia,* that the pickets were interfering with customer pick-ups or deliveries by various businesses including Paoli Meats and Petrini Meat Co., and that his business had been adversely affected by at least 15%; 4) an affidavit by Balestrieri, owner of Fisherman's Wharf Seafood, located on the Pier, stating, *inter alia,* that the picketing had not affected any of his deliveries or pick-ups; and 5) affidavits by the owners of Paoli's and Petrini's that the failure to make pick-ups was not caused by the pickets but by either their own change in operations or due to inadequate staffing. (For a more detailed discussion of the evidentiary record *see* Findings and Conclusions).

As Respondent points out, the affidavits by the owners of Paoli's and Petrini's clearly undermined Svedise's allegations with respect to those two businesses and certainly cast doubt on the validity of his remaining allegations. However, even putting Svedises' testimony aside, we cannot say that that, at that time, the Board did not have at least a reasonable basis for believing that the charge was meritorious, given the location of the pickets, Capurro's declarations (which the Board had no apparent reason to discredit at the time), and the fact that several crucial declarations concerning the union's affirmative efforts to dispel any negative impact were not in the Board's possession until October. Nor did the general guidelines offered by the relevant case law clearly foreclose issuance of the complaint, in light of the record and the particular situs situation presented by this case. Thus, we conclude that the Board was not without a reasonable basis in law and fact when it proceeded with the complaint on September 25, 1984.

### The Board's Litigation Position

To obtain injunctive relief pursuant to § 10(*l*) of the Act, the Board had the burden of establishing reasonable cause to believe that Respondent was picketing with the unlawful objective of interfering with the neutral businesses on the Pier. 29 U.S.C. § 160(*l*). Thus, the Board's litigation position was only substantially justified if it can demonstrate that it had at least a reasonable basis for believing it could meet this burden.

Subsequent to the filing of the Board's petition, respondent submitted a number of additional affidavits in its behalf, indicating, *inter alia,* that respondent was not preventing deliveries to neutral businesses, and that it had taken various steps to encourage commerce on the Pier to continue as usual for the neutral businesses. At respondent's request, the Regional Director agreed to meet on October 9, 1984 to discuss the possibility of reconsidering the Board's position in light of these subsequent affidavits. On October 10, 1984, the Board formally denied Respondent's request for reconsideration. However, between October 9 and October 11, the Board

obtained four additional affidavits which were filed along with the Board's reply brief on October 12, 1984.

The substance of this post-petition evidence is discussed in our *Findings and Conclusions;* however, to briefly recapitulate, these affidavits indicated that 1) the union had not prevented or attempted to prevent pick-ups or deliveries to United Shell Fish or any other neutral business in the vicinity, 2) that Capurro was recanting his earlier assertions that pickets were blocking traffic onto the Pier and that he had lost revenues, and 3) that Respondent had sent mailgrams/letters or made personal calls/visits to ·Capurro's, Castagnola's, United Shell Fish, Canton Fish Market, Petrini's Meat Co., Tamaras Supply, Inc., and Paoli's Meats for the purpose of reassuring those businesses of Respondent's desire that deliveries, pick-ups, and business in general, be continued in its usual manner. Respondent further offered to cooperate in any way to minimize any inconvenience,[10] and also posted signs stating that it had no dispute with any other business on the Pier besides Scoma's and that it had no dispute with Capurro's. The evidence further indicated that the pickets were keeping their signs lowered as they passed Capurro's on their way to visit pickets at Pompeii's Restaurant.

Thus, by October 12, 1984, there was no longer any significant evidence in the record from which an illegal motive could be inferred, except from the location of the pickets.[11] At that point, however, there was also no reasonable basis for inferring an illegal objective from the mere location of the pickets, given the readily apparent legitimate purposes for picketing at the locations described [12] and the clear indication from the union's actions of its intent to avoid interference with neutrals in the area. And during the evening hours, when the neutral businesses on the Pier were closed, the Board's already tenuous inference became that much weaker.

■ In justifying the reasonableness of its position to maintain a complaint, the Regional Director has the responsibility to continually evaluate its position in light of all the surrounding facts and circumstances. *Cf. Retail Fruit and Vegetable Clerks (Crystal Palace) v. NLRB,* 249 F.2d 591, 599 (9th Cir.1957); *See also, Constar, Inc. v. Plumbers Local 447,* 748 F.2d 520 (9th Cir.1984). We conclude that by October 12, 1984, it was unreasonable for the Board to

---

**10.** The Board contends that evidence indicating the union's affirmative efforts to minimize interference with neutral businesses should be discounted because it did not receive this evidence until after the complaint had been issued. However, in light of petitioner's power to withdraw a complaint, this factor is of limited significance. *See, supra,* n. 9.

**11.** The only other evidence the Board pointed to after October 12, 1984, was Svedise's undocumented allegation that his revenues had decreased 15% and an incident involving a delivery by Aark Seafood Company. However, as discussed in our Findings and Conclusions, Svedise's declarations had been so undermined that the Board had virtually abandoned reliance upon them. Moreover, a close examination of the declarations pertaining to the Aark Seafood delivery suggests that Respondent attempted to ascertain the driver's destination, not to stop a delivery to a neutral business. We determined that in light of the record as a whole, the above evidence was insubstantial.

**12.** As we observed in our Findings and Conclusions, "primary, lawful objectives are readily apparent from the particular physical layout in this case. As described above, the physical entrance to Scoma's is approximately 400 feet from the Jones Alley and Jefferson Street intersection, and is not visible from that point. Respondent convincingly argues that to effectively picket the primary employer, potential patrons must be apprised of the strike before they walk or drive the length of the Alley. Moreover, Scoma's maintains a large sign at the intersection and uses the Alley intermittently to shuttle patrons/employees and thus to some extent maintains a presence at the head of and along the Alley. These two factors further indicate that picketing at the locations described above is important to Respondent's ability to effectively picket the primary employer. In addition, the Union has a legitimate and primary objective in picketing in areas that are generally visible in order to fully apprise the public of its grievance with the primary employer." *See* Respondent's Affidavits, pp. 13–14.

It is not clear that the Board ever acknowledged or considered these lawful objectives in its evaluation of the facts and circumstances.

believe that the location of the pickets supplied a sufficient basis for meeting its burden of establishing reasonable cause to believe,[13] in light of the record as a whole, that respondent was picketing with an illegal objective. Accordingly, we conclude that Petitioner has not met its burden of establishing that its position was substantially justified once it continued to pursue this matter after October 12, 1984,[14] and therefore Respondent is entitled to recover fees and expenses incurred in connection with this proceeding after that date.

With respect to the amount of fees and expenses to be awarded, Petitioner has twenty (20) days from the date of this Order to file any specific objections to Respondent's request for fees and expenses incurred in this matter after October 12, 1984, and the reasons therefor. The Court will subsequently issue a separate order regarding the appropriate amount to be awarded.

IT IS SO ORDERED.

## ON AMOUNT OF ATTORNEY FEES

In our May 24, 1985 Order, we found that respondent was entitled to an award under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) (hereafter "Act" of "EAJA"), for attorney fees and expenses incurred after October 12, 1985, and allowed petitioner additional time to file specific objections to the amount of fees and expenses requested. Having carefully reviewed petitioner's objections, respondent's reply thereto, and respondent's documentation, we find that respondent is entitled to an award of $17,015.10 for attorney fees and $614.58 for costs, for the reasons set forth below.

Respondent incurred a total of $30,082.50 [1] in fees and $729.90 in costs in litigating this action. Out of this amount, $7,907 in fees and $115.32 in costs were incurred on or before October 12, 1984; hence this Order addresses respondent's remaining request for $22,175.50 in fees, and $614.59 in costs.

Calculation of the award requires a determination of the appropriate hourly rate multiplied by the number of hours reasonably expended by counsel. *See Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Petitioner objects to the hourly rates requested ($85.00/hour for

13. In addition, the Court notes that Petitioner's position that the location of the pickets provided sufficient justification for pursuing the complaint (*see* Petitioner's Final Response Memorandum at 22–23) is not completely consistent with its prior position in this case. As stated in the Findings and Conclusions, Petitioner, in a letter written on September 13, 1984, originally declined to issue a complaint in response to Scoma's charge, although the location of the pickets at that time was substantially the same as it was on September 25th, or any relevant time thereafter. Petitioner explains its later decision to issue the complaint on the ground that the earlier decision was based on various erroneous assumptions, *e.g.*, that the pickets were only having a "de minimus" impact and that Scoma's had consented to the location of the pickets. However, this explanation is not entirely satisfactory. Given the emphasis the Board has placed on the significance of the pickets' location, it would not appear that any of the alleged erroneous assumptions concerned matters of sufficient magnitude to dissuade the Board against issuing a complaint. For example, even if the charging party agrees to the location, this consent would not necessarily deter the Board from issuing a complaint. (*See*

Petitioner's Final Response Memo at 22 n. 7). Also, as Petitioner has frequently stated, evidence of actual adverse impact is not required to show an illegal objective. Thus, the fact that the Regional Director believed that the pickets' impact was only de minimus would not necessarily lead the Board to refuse to process a complaint.

14. Although our conclusion that the Government's position was no longer justified after October 12, 1984, is based, in part, on the fact that the Board retained, throughout the proceedings, the discretion to withdraw or maintain the complaint, it should be clear that this court has not required nor suggested withdrawal of the complaint in any manner at any time. Thus, our determinations concerning the merits of the petition for injunctive relief and the application for attorney fees pursuant to the EAJA operate independently of the Board's determinations and proceedings in this matter.

1. This figure includes the $2,420.00 in fees respondent incurred in preparing its Reply to Petitioner's Objections to Attorney Fees and Costs and Appendices. (Hereafter "Reply to Objections").

attorneys Matthew Ross and Victoria Chin, and $25.00/hour for law clerks) and contends that an unreasonable number of hours were spent on certain tasks. Petitioner further contends that respondent should not be compensated for briefing on the Rule 11 issue and that certain hours requested have not been properly documented or do not relate to the instant litigation.

### A. The Hourly Rate

Section 2412(d)(2)(A)(ii) provides that "[A]ttorney fees shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee...."

"In enacting this fee limitation, Congress attempted to provide full market compensation for successful litigants while at the same time, containing costs." *Action on Smoking and Health v. Civil Aeronautics Board*, 724 F.2d 211, 217 (D.C.Cir.1984). In determining whether a "special factor" justifies an hourly rate of more than $75.00/hour, the Ninth Circuit recently held that it is proper for the court to apply the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied sub. nom., Perkins v. Screen Extras Guild, Inc.*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). *Underwood v. Pierce*, 761 F.2d 1342, 1347 (9th Cir.1985).

■ The twelve *Kerr* factors are 1) the time and labor required, 2) the novelty and difficulty of the questions, 3) the skill requisite to perform the legal service properly, 4) the preclusion of employment by the attorney due to acceptance of the case, 5)

the customary fee, 6) whether the fee is fixed or contingent, 7) time limitations imposed by the client or the circumstances, 8) the amount involved and the results obtained, 9) the experience, reputation, and ability of the attorneys, 10) the undesirability of the case, 11) the nature and length of the professional relationship with the client, and 12) awards in similar cases. *Kerr, supra,* 526 F.2d at 70.

In *Underwood, supra,* the Ninth Circuit upheld the district court's award of hourly rates ranging from $80 per hour for work in 1976 to $120 per hour for work in 1982 in light of several special factors including the novelty and difficulty of the issues, the contingent nature of the fee, the undesirability of the case, the expertise of counsel, the amount involved and the results obtained, and the customary fees and awards in other cases. *Underwood, supra,* 761 F.2d at 1347.

■ Petitioner states that, here, there are no special factors justifying a rate of more than $75 per hour. We disagree. The exceptional results obtained,[2] the novelty and difficulty of the questions, and the high quality of the representation warrant an upward adjustment of the $75 per hour rate. *See generally, Action on Smoking and Health, supra,* 724 F.2d 211.

As respondent has documented, the National Labor Relations Board ("NLRB") prevails in an extremely high percentage of the petitions brought under § 10(*l*) of the National Labor Relations Act.[3] Operating under considerable time constraints, respondent obtained exceptional results by persuading the court that petitioner had not met its minimum burden in a factually difficult and unusual case. Its successful

---

**2.** In *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983), the Court emphasized, in the context of a 42 U.S.C. § 1988 fee case, that "the most critical factor is the degree of success obtained".

**3.** The last published data on the Board's success rate in § 10(*l*) injunction cases appears in the Board's 1981 Annual Report. 46 *NLRB Ann. Rep.* 225 (1981). (*See* Reply to Objections, Appendix B). There were 67 § 10(*l*) injunctions

litigated to final order in district courts in fiscal year 1981. Of these 67 cases, the Board prevailed in 59, for a success rate of 88%.

Unpublished preliminary data for fiscal year 1982 shows that of 71 cases litigated to final order, the Board prevailed in 65, for a success rate of 91%. (*See* Declaration of Andrew J. Kahn in support of Repondent's Reply to Objections at 1–2).

defense enabled respondent to continue its picketing activities without substantial curtailment.[4] Finally, we note that respondent's oral and written presentations were of high caliber and reflected counsel's expertise in such matters.[5]

With respect to the attorney fees application, although respondent did not obtain optimal results, given this court's finding that petitioner's position was "substantially justified" on and before October 12, 1984, the award of fees and costs incurred after October 12, 1984, still represents a significant success. Apparently, it is the first such award against the NLRB. (*See* Declaration of Ross, ¶ 16 and Exhibit B). In addition, petitioner raised a novel and important issue concerning the eligibility of local unions under the Act. Respondent, by prevailing on this issue, obtained a valuable precedent.

In addition to allowing for an upward adjustment of the hourly rate based on "special factors", § 2412(d)(2)(A)(ii) of the Act specifically allows the Court to make such an adjustment based on an increase in the cost of living. According to the Consumer Price Index, "All Urban Consumers" Index, the "U.S. city average" cost of living increased 11.8% between October 1981 and August 1984. Dep't of Labor, *Monthly Labor Review*, Vol. 106, No. 11 (Nov. 1983), and Vol. 107, No. 11 (Nov. 1984). The declaration of Ross, ¶ 11, page 5, also indicates that the billing rate for respondent has increased slightly over 10% since 1981 when the Act became effective due to increased operating costs.

We conclude that the special factors discussed above, and the increased costs since EAJA's enactment, "justify" enhancing the hourly rate to $85 per hour for respondent's counsel. 28 U.S.C. § 2412(d)(2)(A)(ii).

■ Petitioner also objects to the $25 hourly rate requested for time spent by law clerks. While courts have taken various approaches to this issue, *compare Cole-*

*man v. Block*, 589 F.Supp. 1411, 1417, 1422 (D.N.D.1984) *with Ashton v. Pierce*, 580 F.Supp. 440, 443 (D.D.C.1984), *and Hyatt v. Heckler*, 586 F.Supp. 1154, 1157 (W.D.N. C.1984), *vacated and remanded on other grounds*, 757 F.2d 1455 (4th Cir.1985), we believe that a $25 hourly rate is reasonable, appropriate, and supported by the case law. *See Burt v. Heckler*, 593 F.Supp. 1125, 1132–33 (D.N.J.1984); *Hyatt, supra*. Such a rate will compensate respondent for fees incurred, and as noted by the court in *Burt, supra*, reducing this rate would only "discourage the use of law clerks who operate at a significantly lower hourly rate than attorneys." 593 F.Supp. at 1133.

### B. Reasonableness of Hours Expended

■ Counsel are only entitled to compensation for hours reasonably expended. They must exercise billing judgment and make a "good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary…" *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Action on Smoking, supra*, 724 F.2d at 220.

■ Petitioner first contends that 40 hours was an excessive amount of time to spend preparing proposed findings of fact and conclusions of law re: denial of the petition for injunctive relief, and suggests that only four hours were needed. At the outset, we note that the Court requested counsel to prepare detailed proposed findings and conclusions with citations to the record. In addition, we reject the Board's suggestion that petitioner's conclusory "boiler-plate" proposed findings and conclusions provide an appropriate yardstick. Given the minimal burden borne by the Board, the extensive record, and the fact that such injunctions are rarely denied, petitioner's proposed findings and conclusions certainly do not provide a helpful or appropriate reference.

---

**4.** *See also*, Declaration of Sherri Chiesa in support of Respondent's Reply to Objections.

**5.** *See also*, Declaration of Laurence P. Corbett in support of Respondent's Reply to Objections.

Nevertheless, we conclude that 40 hours goes somewhat beyond a reasonable investment of time given the relative brevity of the proceedings involved. Thus, we will reduce the number of hours by 10 for a total of 30 hours for preparation of the proposed findings of fact and conclusions of law.

Petitioner also contends that the request for fees incurred during litigation of the attorney fees application are excessive. Respondent seeks $1,079.50 for research and preparation of the original EAJA application and supporting memoranda, $399.50 to prepare supporting declarations and itemized bills, $255.00 for preparation of an alternative motion for attorney fees, $9,180 for research and preparation of a reply brief, $326.00 for research and preparation of papers concerning a request for judicial notice, and $340.00 for oral argument, for a total of $11,580.[6]

■■■ Although petitioner vigorously opposed the fee application and raised a novel and significant threshold issue concerning the eligibility of local unions, petitioner's claim, that the fees incurred in preparing the reply to the Board's opposition are excessive, has merit. In our view, counsel should have exercised their billing judgment to limit the fees incurred, or trim the fees requested, on this item to $6,520.00 (62 attorney hours, and 50 law clerk hours).[7]

## C. Rule 11 Issue

At the hearing on the attorney fees application, the Court raised *sua sponte* the question of whether respondent was entitled to attorney fees under Rule 11 in this instance, and ordered respondent to submit an opening and reply brief. Petitioner argues that it would be inappropriate to assess the Board for any fees related to this matter because they were not incurred as a

consequence of any matter put in issue, or any position unreasonably taken, and because the matter was raised *sua sponte* by the Court.

We find no authority addressing this situation; however, we disagree with petitioner's conclusion that the fees were not incurred due to any position unreasonably taken. Had petitioner not unjustifiedly pursued the injunction after October 12, 1984, the whole matter of attorney fees, including Rule 11 as a possible basis for such an award, would not have been raised.

■■■ Similarly, we do not believe that because the matter was raised by the Court, as opposed to the parties, that the government is immune from liability. That the Court may raise a matter *sua sponte* which will cause parties to incur additional fees and/or costs is always a risk inherent in any litigation. By pursuing this litigation after its position was no longer substantially justified, petitioner assumed the risk of such additional fees and expenses. *See State of Arizona v. Maricopa City Medical Society*, 578 F.Supp. 1262, 1277 (D.Ariz.1984) (fee award covered unspecified "supplemental information" requested by the Court). Thus, in determining whether fees incurred in this matter are compensable we will simply treat the matter as an alternative claim raised for recovery of fees.

■■■ Petitioner further contends, however, that an award is still inappropriate because it prevailed on this claim. Under established principles, we find this argument unavailing. Although neither the EAJA, nor its legislative history, address the appropriate scope of recovery where a party has not prevailed on every claim, courts have turned to case law concerning 42 U.S.C. § 1988 or other fee shifting statutes for guidance. *See e.g., Action, supra,*

---

**6.** These calculations are based on an $85/hour fee for attorneys and a $25/hour fee for law clerks.

**7.** Petitioner's position that respondent is not entitled to any attorney fees incurred in responding to reasonable arguments advanced in opposition to the award is rejected as contrary to the

purposes of the Act, and its reliance on *Cornella v. Schweiker*, 741 F.2d 170 (8th Cir.1984) in this regard is misplaced. We similarly decline to embrace petitioner's argument that the EAJA related fees should be further reduced based on a theory of "proportionality."

724 F.2d at 215–216; *Grand Blvd. Improvement Co. v. City of Chicago*, 553 F.Supp. 1154 (N.D.Ill.1982).[8] Such case law instructs that if an unsuccessful claim is completely distinct, compensation for that claim is improper. However, where the claims involve a "common core" of facts and pertain to related legal theories, an award should not be reduced because the party fails to prevail on each theory advanced for the requested relief. *Hensley, supra*, 461 U.S. at 435, 103 S.Ct. at 1940; *Rivera, et al. v. City of Riverside, et al.*, 763 F.2d 1580 (9th Cir.1985); *Ackerley Communications, Inc. v. City of Salem, Oregon*, 752 F.2d 1394, 1397 (9th Cir.1985), *cert. denied sub nom.*, *County of Multnomah v. Ackerley Communications, Inc.*, —— U.S. ——, 105 S.Ct. 3503, 87 L.Ed.2d 634 (1985).

Here, it is clear that the Rule 11 issue was a related, alternative theory for recovery of fees. Moreover, as was stated in our Order of May 24, 1985, the additional briefing was requested in part because of "the expectation that such briefing would further aid the court in determining the issue of substantial justification" and the parties used the opportunity to further advance their positions on this issue. That both theories revolved around a common core of facts is clearly evident from the parties' papers. Accordingly, we conclude that respondent is entitled to compensation for the time spent in connection with the Rule 11 briefing.[9]

### D. Miscellaneous

### 1. Unrelated Fees

Petitioner points to a total of 2.8 hours of attorney time which does not appear to have been expended in connection with the instant litigation, and respondent concedes that these hours should be deleted. Ac-
cordingly, the award shall be reduced by $238.00 ($85/hour × 2.8 hours).

### 2. Improperly documented hours

Petitioner points to a total of 10.3 hours which it contends are not supported by sufficient documentation. These hours, incurred over 11 days in a three month period are primarily described as simply being spent on "legal research" (see also 0.4 hours for "telephone call; discussion" on 11/15/84; 0.4 hours for "research: case cites" on 11/7/84, and 0.3 hours for "discussion, legal research" on 11/15/84).

A "fee applicant bears the burden of … documenting the appropriate hours expended … and should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Action on Smoking, supra*, 724 F.2d at 220 (*quoting Hensley, supra*, 461 U.S. at 437, 103 S.Ct. at 1941). While respondent's documentation for the most part is ample, we agree that the above descriptions are too vague to enable adequate assessment of their reasonableness. However, it is generally recognized that "deficiencies in documentation are cause for reduction rather than outright denial of fees", *Action on Smoking, supra*, 724 F.2d at 220. Here, we conclude that a 40% reduction is appropriate with respect to the 10.3 hours in question. Accordingly, the $506.00 requested for these hours shall be trimmed to $303.60.

### 3. Refiling of attorney fees application

On November 2, 1984, and November 15, 1984, respectively, respondent filed its EAJA application and itemized statement of fees and expenses. On December 17, 1984, petitioner filed its opposition thereto, arguing, in part, that the application was premature because the Court had

---

**8.** Although these cases involve multiple claims advanced on the underlying merits, the general principles espoused appear transferable to multiple claims advanced with respect to the recovery of attorney fees as well.

**9.** Petitioner does not alternatively contend that the number of hours spent in connection with this matter was unreasonable, and our review does not suggest any basis for reduction.

not yet filed its Findings and Conclusions and Order denying the § 10(*l*) petition. On January 7, 1985, shortly after the above was filed, respondent filed a timely alternative application. We reduce respondent's award by the $255.00 incurred to prepare the duplicative second application.

4. *Respondent's reply to petitioner's objections to attorneys' fees and costs*

Since oral argument had been limited to issues concerning respondent's entitlement to fees, we granted respondent's request for an opportunity to respond to petitioner's post-hearing objections to attorney fees and costs. Respondent claims an additional 22 attorney hours at $85/hour and 22 law clerk hours at $25/hour, for a total of $2,420.00 in fees for this reply. (Respondent has not provided any documentation of associated costs). Petitioner, of course, has had no chance to object to this request; however, our review suggests that petitioner's objections did not warrant a response of such length and detail as was submitted. Thus, applying the standard that compensation is only proper for a "reasonable number of hours expended", *Action on Smoking, supra,* 724 F.2d at 220, we reduce the amount requested to $1465.00 (14 attorney hours at $85/hour and 11 law clerk hours at $25/hour.

### E. Conclusion

Based on the above resolutions of petitioner's objections, and our own review of the record, we are satisfied that respondent is entitled to an award of $17,015.10 in attorney fees and $614.58 in costs.[10]

Accordingly, IT IS HEREBY ORDERED that petitioner pay respondent the amount of $17,629.68 within 25 days of the date of the original August 5, 1985 Order.

IT IS SO ORDERED.

---

10. Petitioner has not objected to the request for costs; nor do we find reason to reduce the amount requested. Thus the $614.58 requested

is allowed. *Preston v. Heckler,* 596 F.Supp. 1158, 1161 (D.Alaska 1984).