**Debra L. ACKERMAN, Plaintiff,**

v.

**WESTERN ELECTRIC COMPANY, INC., a corporation; Communication Workers of America, Local 9490, an unincorporated Labor Union; Does 1–10, Defendants.**

No. C–84–3037–WWS.

United States District Court,
N.D. California.

Sept. 2, 1986.

Memorandum of Opinion and Order re Attorney's Fees Sept. 2, 1986.

Madeleine Tress, San Francisco, Cal., for plaintiff.

William G. Alberti, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants.

### MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

#### PROCEDURAL BACKGROUND

Plaintiff filed this action in state court on May 13, 1983. She asserted various claims arising out of her discharge against her former employer, Western Electric Company, Inc., now AT & T Technologies, Inc. ("the Company") and her collective bargaining representative, Communications

Workers of America, Local 1490 ("the Union"). The action was removed by defendants to this Court. Jury trial was waived by the parties.

After extended proceedings, plaintiff settled and dismissed the claims against the Union, and the Company moved for partial summary judgment on all claims except the sixth and ninth causes of action. On July 11, 1985, the Court requested briefing on the sixth and ninth causes of action and the Company moved for summary judgment on these claims as well. By order filed September 27, 1985, the Court dismissed all claims for breach of the collective bargaining agreement, for misrepresentation and for intentional and negligent infliction of emotional distress.

 Only the claim for handicap discrimination under the California Fair Employment and Housing Act ("the Act") remained. Cal.Gov.Code § 12940.[1] The Court found that the record was insufficient to afford a basis for decision and observed that the parties had failed adequately to address the material issues under the statute and the regulations. To aid in further proceedings, the Court outlined the elements of a prima facie case and the defenses available under the statute, and directed the parties to submit their evidence on these issues. Substantial time was granted them to do so. That evidence along with memoranda by counsel was then submitted.

On the basis of that evidence and the prior record, the Court prepared a proposed opinion and order granting summary judgment for plaintiff on the issue of liability. The proposed opinion was submitted to counsel for comments and objections on

---

1. Under the doctrine of pendent jurisdiction, the Court may exercise its discretion to retain and decide plaintiff's state law claim of handicap discrimination. *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966). Pendent jurisdiction exists because there were sufficiently substantial federal claims to confer jurisdiction on this Court in the first instance, and the state and federal claims share a "common nucleus of operative facts." *Id.* at 725, 86 S.Ct. at 1138. The Court

expended considerable time and effort in considering the state claim before the federal claims were dismissed, *see Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 903–04 (9th Cir.1983); retention of the state claim is therefore justified by judicial economy, convenience and fairness to the litigants. *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Hagans v. Lavine,* 415 U.S. 528, 545–46, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974); *In re Nucorp Energy Securities Litigation,* 772 F.2d 1486, 1490–91 (9th Cir.1985).

March 27, 1986. Comments and objections were received from counsel whereupon the Court afforded the parties repeated opportunities to submit evidence and briefs on all claims and defenses. The parties were not restricted, as they would be in a trial, to making their case with the evidence on hand but were given from March to August 1986 to produce facts and submit arguments on any issues they deemed material.[2] The Court has considered all of the parties' claims and defenses and the evidence and arguments submitted. It has concluded that no material facts are in dispute, and hence that no trial is required. The parties dispute not what the facts are but what interpretation to give them and what conclusions to draw from them. No reason appears therefore why judgment should not be rendered on the record before the Court.

## FACTS

The Company installs, modifies and removes central office telecommunications equipment. Plaintiff was hired by the Company as an installer in May 1978. In June 1981, she contracted a bronchial infection, which aggravated her preexisting asthmatic condition, and went on disability leave. On April 9, 1982, the Company advised her that it had learned that she was unable to return to work and that she would therefore be discharged on the expiration of her disability benefits. On April 12, plaintiff returned to work with a note from her treating physician releasing her for work with the restriction "to stay away from dust, heavy exercise." A Company doctor saw her and returned her to work with similar restrictions. On April 13, plaintiff and her Union steward met with her supervisor who advised them that the Company would not put her back to work as an installer, apparently because the Company Benefits Committee had determined that she was unable to return to sustained industrial work as a result of her asthma. She continued to receive disability benefits until June 15, 1982, at which time she was terminated for disability. This action followed.

**2.** For example, after the issuance of the proposed opinion on March 27, 1986, the Court invited plaintiff to submit her evidence on attorney's fees and damages, including back pay. In response to an objection raised by defendant, the Court requested that the parties submit further legal briefing with respect to the termination of back pay liability. Defendant then submitted a memorandum of law asserting in a conclusory manner that the Company had satisfied its burden of proof in establishing that plaintiff would have been laid off in a force reduction on December 10, 1985. Plaintiff, however, submitted evidence that she might have avoided the December 10, 1985 force reduction by transferring to another AT & T subsidiary. By letter dated July 24, 1986, the Court advised that

Defendant's memorandum fails to address the possibility that plaintiff may have transferred to AT & T Communications or otherwise avoided the December 10, 1985 force reduction. Therefore, on this record, defendant has failed to meet its burden of establishing by clear and convincing evidence the date of plaintiff's termination. Since all uncertainties are to be resolved against the allegedly discriminating party, the issue of whether backpay liability ceased on the date of the force reduction would have to be resolved in favor of plaintiff.

Since defendant may not be fully aware of the posture of the case on this issue, the Court will afford it another opportunity to supplement the record on the issue. Defendant may have to August 4, 1986, in which to file any supplementary declaration or exhibit bearing on the date on which plaintiff's employment by defendant in any capacity would have ceased, and on the amount of any severance benefits she would have received.

Further, in response to defendant's continuing objection that it had been precluded from submitting its damage evidence, the Court invited defendant "to submit further briefing and any evidence it wishes to present with respect to any and all other damages issues." Defendant filed additional evidence on August 18, 1986. Plaintiff filed a reply brief on back pay and damages the same day.

Both plaintiff and defendant were given repeated opportunities to supplement the record on attorney's fees as well.

A jury having been waived by the parties, and no issues of credibility or testimonial weight being material to this decision, there is no way that a conventional trial could have afforded the parties a more full and fair opportunity to litigate their dispute.

## DISCUSSION

### A. *Plaintiff's Prima Facie Case*

█ Under the Act, it is an unlawful employment practice for an employer to discharge a person because of a physical handicap, or to discriminate against such a person in the terms, conditions or privileges of employment. Cal.Gov.Code § 12940. The regulations promulgated pursuant to the statute, (Cal.Gov.Code § 12935(a)), which the Court accepts as binding,[3] provide that a prima facie case of physical handicap discrimination is established "by showing that an employment practice denies ... an employment benefit to a qualified handicapped individual and that the employment benefit was denied because of the qualified handicapped individual's physical handicap." Cal.Admin. Code tit. 2, § 7293.7. A "qualified handicapped individual" is defined as "[a]ny handicapped individual who, *with reasonable accommodation,* can perform the essential functions of the job or training program in question." Cal.Admin.Code tit. 2, § 7293.6(k) (emphasis added).

It is not disputed that plaintiff, because of her asthmatic condition, is a handicapped person and that she was discharged because of her handicap. Under the regulation, to be entitled to relief she must establish that she is a qualified handicapped individual. Therefore, to establish her prima facie case plaintiff must come forward with admissible evidence tending to show, in accordance with § 7293.6(k), that

(1) she can perform the "essential functions" of the position,

(2) with "reasonable accommodation" to her handicap.

### 1. *Essential Functions*

In light of Ackerman's work restrictions, the Court must determine whether the performance of strenuous tasks requiring heavy exertion or exposure to dust without adequate protective devices is an "essential function" of the installer position. That determination requires an analysis of the job tasks and work assignment system for installers.

#### a. *The Index Plan.*

The Company maintains an Index Plan which separates installers into five job classifications, known as index 1 through index 5. The classifications represent levels of skill and experience, with a higher number index indicating a higher level of skill and general competency. The installers' Index Plan lists work operations codes which correspond to specific job duties: the 200 series corresponds to index 2 level operations, the 300 series corresponds to index 3 level operations, etc. Installation work is performed by crews of 13 to 18 installers of varied index levels. Within a crew, each installer is given a daily work assignment by his or her supervisor.[4] In making assignments to an individual installer, the supervisor takes into account the installer's index level, the demonstrated skills of the particular installer and his or her physical strengths or limitations. Installers are responsible not only for work operations at their own index level but also for operations at other levels as the needs of the business may require. To promote efficiency, the highest index work operations are generally assigned to the highest index installers available. To meet business needs, however, all installers must be prepared to perform all work operations for which they are or may become qualified.

---

**3.** The Court also accepts as relevant authority the precedential decisions of the California Fair Employment and Housing Commission ("CFEHC") interpreting the Act. *See* Cal.Admin. Code tit. 2, § 7285.3. The opinions of the Commission are collected in the FEHC Precedential Decisions Service published by California Continuing Education of the Bar. Federal law is not determinative in the construction of the Act, "but, in the spirit of comity, shall be considered to the extent practical and appropriate." Cal. Admin.Code tit. 2, § 7285.1.

**4.** Each installer maintains a daily record of work operations assignments, and at six months intervals the Company aggregates these records to compile an Installer Experience Record. The Installer Experience Record documents the nature of each installer's job duties over time, and is the source of both parties' statistical evidence.

For example, an entire crew, including index 3, 4, and 5 installers, may be occupied with basic index 2 level work operations for periods of up to two weeks at a time. Alternatively, an index 2 may perform index 3, 4, or 5 operations if no higher index installers are available, or if the Company needs to train installers in higher index work operations for possible advancement, or for other reasons.

The Company's system of advancement and promotion relies heavily upon an installer's accumulation of work hours in higher index work operations. All installers start out at index 1, and are assigned primarily index 2 level work, since there are no index 1 level work operations codes. When an installer has achieved adequate proficiency in a given work operation code, a supervisor will certify that the installer is "qualified" in that work operation. To advance through the index levels under the Index Plan, an installer must meet certain minimum hours requirements, must be rated "qualified" in certain work operations codes at the next higher level, and must demonstrate that he or she has attained the overall proficiency associated with the next index level classification. There is no guarantee, however, that an installer will be promoted on the basis of hours or seniority since an installer may not achieve sufficient competency in higher work operations or receive sufficient higher index level assignments to qualify for advancement.

Debra Ackerman was hired as an index 1 on May 22, 1978. She was promoted to index 2 on May 28, 1979, and remained an index 2 until her termination on June 15, 1982. At the time she was terminated, Ackerman had worked 2493 hours in index 2 operations, and 2845 hours in index 3 and 4 level work operations.

b. *The essential functions of the index 2 installer position.*

■ Since Ackerman was an index 2 at the time of her termination, the most pro-bative evidence relates to the essential functions of the index 2 installer position as performed by her from May 1979 until June 1982. Index 2 level work operations generally include the most physically demanding and dust-generating work,[5] (primarily "ironwork" and cabling), and the physical requirements of the job diminish at higher levels of skill as emphasis shifts to light-duty operations such as wiring and trouble-shooting. Based on the information submitted by the Company, the work operations most commonly performed at the index 2 level are as follows:

*Code 200—Assemble, Erect, Align and Mount (hereafter "ironwork").* Installers erect and align iron equipment frames, 9 to 11½ feet tall, in telephone company central offices and mount equipment units in the frames. This code also encompasses tearouts, or the demolition of ironwork previously erected. Ironwork frequently requires heavy exertion, including repeated trips up and down ladders and scaffolding, frequent lifting and carrying of equipment weighing more than 25 pounds, and the use of power tools above shoulder level. Ironwork also entails unavoidable exposure to dust in the course of tearouts and roto-hammer drilling of holes in concrete floors to secure the equipment frames. *Code 201—Cabling.* Installers run telephone cable between the various equipment frames housing switching, distribution and power equipment. Cable is delivered to the workplace on reels approximately five feet in diameter, carrying 300 to 1000 feet of cable approximately ¾ of an inch in diameter, and weighing 150 to 600 pounds or more. One to three installers use a jackstand to lift the reel and mount it on an iron bar, allowing it to turn freely. The cable is then pulled off the reel and is typically laid out on the floor to be measured, marked, cut and tagged. The cable is carried up a ladder 11½ feet to cable racks located

---

5. Dust is present in all but the most controlled environments. Accordingly, some dust exposure is unavoidable in the installers' work environment, as in almost any work environment. Therefore, the Court has attempted to identify those tasks which generate extraordinary amounts of dust.

above the equipment bays. The cable is then pulled through the racks by installers positioned along the intended route. Because there is typically not enough room to stand, installers must squat, crouch, kneel or lie flat in the racks. Cabling frequently requires heavy exertion as installers pass and pull the cable through the racks. The pulling is a vigorous group effort, with six to ten installers all pulling together from one to six cables simultaneously on a long cable run. The cable lengths range from five feet up to several hundred feet run between floors. On cable runs between floors, the cable is guided through the floors by runners wearing headphones. Unavoidable exposure to dust is common. The cable racks are confined spaces, and are not susceptible to any thorough cleaning method. The pulling of the cables through the racks therefore stirs up dust.

*Code 202—Basic Wiring.* After a cabling job is complete, each end of the cable will hang down from the cable racks adjacent to connectors on the appropriate equipment bays. Some pulling may be required to position the cable properly. An installer strips away the cable insulation to expose multiple wires which the installer fans, forms and connects with a wrap gun or solder gun. Installers make these connections at varying heights on the equipment and repetitive ladder climbing is frequently required. Wiring is light-duty work requiring relatively little exposure to dust, but some exposure to solder fumes.

*Code 300—Complex Wiring.* Installers perform the same tasks as in basic wiring (Code 202), except that the wiring schemes are more complex. Like basic wiring, complex wiring requires manual dexterity but relatively light exertion and minimal dust exposure.

*Code 301—Basic Test.* Installers perform basic testing using equipment weighing five to 25 pounds. Testing is performed at all heights and installers frequently carry test equipment up ladders. Test equipment weighing more

than 25 pounds is left at floor level. This code requires moderate exertion and light dust exposure.

While ironwork and cabling entail substantial physical exertion and exposure to dust, these index 2 codes also encompass light-duty tasks such as stencilling in the course of ironwork, measuring, cutting, and tagging cables, and guiding cables between floors in cabling. In addition, basic wiring and operations performed at higher index codes require only light to moderate exertion and relatively little exposure to dust.

In determining the essential functions of an index 2 installer, one must consider the relative frequency of particular work operations. That information is found in the records maintained by the Company in the regular course of its business. Both parties rely on data drawn from those records. There is no dispute as to the data, only as to the selection of the relevant periods to be considered.

Plaintiff relies on the data covering the entire three year period during which she was employed as an index 2 installer, from May 1979 to June 1982. During that period the overall work experience of San Francisco-based index 2s with respect to the frequency of work operations was as follows:

**ALL INDEX 2 INSTALLERS**

| Operation Code | % of Hours Worked |
|---|---|
| 200—Ironwork | 20.0% |
| 201—Cabling | 21.2% |
| 202—Wiring-Basic | 34.3% |
| 300—Wiring-Complex | 17.6% |
| 301—Testing | 3.8% |
| —Other | 4.1% |

At 51.9%, basic and complex wiring was the most common work operation for these index 2s; ironwork and cabling comprised 41.2% of the hours worked by this group. Because of the daily assignment system previously described and the vagaries of work demands at various job sites, the mix of duties performed by individual installers varies considerably. In addition, installers particularly proficient at certain duties will often be assigned to those duties. Acker-

man was particularly proficient at wiring, and, consequently, her individual work experience over the same period differed from the norm in that it consisted predominantly of duties involving light exertion and relatively little dust exposure.

### DEBRA ACKERMAN

| Operation Code | % of Hours Worked |
|---|---|
| 200—Ironwork | 2.5% |
| 201—Cabling | 9.0% |
| 202—Wiring-Basic | 9.4% |
| 300—Wiring-Complex | 64.8% |
| 301—Testing | 4.7% |
| —Other | 9.6% |

Basic and complex wiring together comprised 74.2% of all hours worked by Ackerman, with cabling comprising only 9.0% and ironwork only 2.5%.[6]

Defendant relies on data selected from its records for different periods. One of those is the entire period of Ackerman's employment, combining both index 1 and index 2 work hours. Even for that period, ironwork and cabling comprised only 24.2% of her work:

| Operation Code | Index 1 & 2 |
|---|---|
| 200—Ironwork | 11.1% |
| 201—Cabling | 13.1% |
| 202—Wiring-Basic | 20.7% |
| 300—Wiring-Complex | 44.8% |
| 301—Test | 3.1% |
| —Other | 7.2% |

It also refers to the period of seven months immediately preceding her discharge in which ironwork and cabling constituted 32% of her duties, and to the last month of her work, when cabling alone constituted 88% of her duties.

The record shows that not all work recorded as ironwork and cabling necessarily involved exertion and exposure to dust.[7] As previously discussed, these work operations codes include some non-standard and

light-duty tasks such as stencilling and cable preparation. Further, some of the persons engaged in more typical ironwork and cabling operations provide necessary assistance to others, such as by guiding cable or relaying instructions, which is not strenuous or dust intensive. The bare percentage figures, therefore, do not reflect the degree of an employee's exposure to dust and exertion. It is not necessary, however, to go behind the data as recorded. Clearly the best evidence of what constituted the essential functions of the index 2 position as performed by plaintiff was her work record over the three year period of her employment as an index 2. That record shows that not more (and presumably somewhat less) than 11.5% of her work involved heavy exertion and/or extraordinary exposure to dust.

These facts demonstrate that while ironwork and cabling are essential functions for index 2 installers *as a group*, they are not essential to any particular individual's performance of the job. Over a three year period as an index 2, Ackerman spent only 2.5% of her work hours on ironwork and 9.0% on cabling, as opposed to 74.2% on basic and complex wiring. There is no evidence that her handicap ever interfered with her ability to perform all assigned tasks. Given the flexibility in the Company's work assignment system, and Ackerman's individual work experience, the Court concludes that while ironwork and cabling are work operations performed by index 2 installers, the amount of that work, and in particular that part requiring heavy exertion and dust exposure, performed by Ackerman was proportionately so insignificant that it cannot be considered an essential function of her position.

---

**6.** Even in the period when she was an index 1 (May 1978—May 1979) basic and complex wiring comprised as much as 49.7% of Ackerman's work hours:

| Operation Code | Index 1 |
|---|---|
| 200—Ironwork | 26.9% |
| 201—Cabling | 20.6% |
| 202—Wiring-Basic | 41.5% |
| 300—Wiring-Complex | 8.2% |
| —Other | 2.8% |

While Ackerman also performed a substantial amount of ironwork and cabling during this period, the percentage of her time spent on these operations decreased significantly when she was promoted to index 2.

**7.** For example, while 88% of Ackerman's hours in her last month on the job were billed to code 201–Cabling, she was in fact cleaning circuits, a light duty job that is not a standard cabling task.

## 2. *Reasonable Accommodation*

■ To establish her prima facie case, Ackerman must produce evidence tending to show that with reasonable accommodation she could perform the same range of essential functions as she performed during the three years she worked as an index 2 and that she could do so in a manner consistent with her subsequent work restrictions. In establishing her ability to perform the essential functions of the index 2 installer position, plaintiff has based her showing on the premise that some "reasonable accommodation" to her handicap would be made. Under the regulation, "reasonable accommodation" is defined to include

> Job restructuring, reassignment or transfer, part-time or modified work schedules, acquisition or modification of equipment or devices, the provision of readers or interpreters, and other similar actions. Cal.Admin.Code tit. 2, § 7293.9(c).

Specifically, Ackerman contends that she could perform the essential functions of the installer position if the Company were to allow her to wear a simple paper mask, make a minor reassignment of job duties so that duties within the cabling and ironwork codes assigned to her would require her to pull or lift no more than 25 pounds, and excuse her from tearouts completely.

Even if it is assumed that some ironwork and cabling is an essential function of her position, Ackerman has met her burden of establishing that she can perform the duties of that position with reasonable accommodation. First, Ackerman performed all of her assigned duties for a period of three years prior to her termination. Second, with the proposed accommodations, a paper mask and the assignment of particularly strenuous job operations to others on her crew if necessary,[8] there is no reason to believe she will not be able to perform substantially the same range of duties that she performed without apparent difficulty

prior to her disability leave, that is, primarily wiring with the remainder of her time distributed between other operations codes. There is no evidence—medical or otherwise—suggesting that she is not capable of performing those duties. Finally, ten months after her termination and during the one-year period she was under work restrictions, Ackerman found and has maintained employment in a job requiring moderate exertion and exposure to dust. As a lab assistant at Vector Laboratories, Ackerman does warehousing, lifts cases of glassware weighing 30 to 40 pounds each, climbs a ladder to stack packing kits weighing 12 pounds each, moves catalog cases weighing 48 pounds each, and performs janitorial work such as sweeping and mopping and wiping dust off shelves and boxes. This janitorial work entails considerable exposure to dust against which a simple paper mask has provided Ackerman with adequate protection. Thus, her demonstrated ability to perform a job requiring moderate physical exertion and some exposure to dust supports her contention that she could perform under similar conditions as an index 2 installer if the Company made reasonable accommodations.

The accommodations suggested by Ackerman are reasonable. Ackerman's wearing a paper mask poses no difficulties for the Company. The work modifications proposed by Ackerman would entail assignment to others of only particularly strenuous tasks representing historically an insignificant percentage of Ackerman's work. And even some job duties falling within the ironwork and cabling codes are within Ackerman's ability to perform notwithstanding her work restrictions, including stencilling, aligning iron frames and mounting equipment weighing less than 25 pounds, sewing, measuring, cutting and tagging cable lengths to be run, and guiding cable on runs between floors. The evidence dis-

---

8. The Company's evidence indicates that entire crews are occasionally occupied with strenuous or dust-generating tasks for periods of up to two weeks. If reassignment of job tasks to another member of the same crew were not feasible, the record shows that Ackerman could be temporarily assigned to a different crew, or to "float" among crews according to demand for her skills.

closes, moreover, that the Company currently employs other installers subject to work restrictions, and Ackerman is entitled to like treatment. Finally, Ackerman had performed a substantial number of hours in index 3 level work operations at the time of her termination. Although there is no guarantee of advancement on the basis of hours worked or seniority, a promotion to index 3 would increase the proportion of light-duty work, thereby further mitigating the effect of Ackerman's work restrictions.

### B. *Affirmative Defenses*

Plaintiff having established a prima facie case of handicap discrimination, the burden of production shifts to defendant to defeat it by establishing an affirmative defense. Two affirmative defenses are available to the Company:[9] (1) the health or safety of the qualified handicapped individual (the "safety defense"), and (2) undue hardship.

#### 1. *The Safety Defense*

■ To establish the safety defense, the Company must demonstrate that

after reasonable accommodation the ... employee cannot perform the essential job functions of the position because the job imposes an imminent and substantial degree of risk to the ... employee. Cal. Admin.Code tit. 2, § 7293.8(b).

The safety defense has been given narrow scope. It must be tailored to the individual characteristics of the employee in relation to specific, legitimate job requirements. *Sterling Transit Co. v. Fair Employment Practice Comm'n,* 121 Cal.App.3d 791, 798, 175 Cal.Rptr. 548, 551 (1981). The risk of injury to the employee must be imminent and substantial, Cal.Admin.Code tit. 2, § 7293.8(b), and the mere possibility of future injury is not sufficient. *Sterling Transit,* 121 Cal.App.3d at 799, 175 Cal. Rptr. 548; *Johnson v. Civil Service*

*Comm'n,* 153 Cal.App.3d 585, 590–91, 200 Cal.Rptr. 289, 291–92 (1984).

The Company's safety defense is based on a literal interpretation of plaintiff's work restriction, "to stay away from dust, heavy exercise." The Company treats that restriction as barring plaintiff for safety reasons from performing the installer's job because it involves some dust and some exertion.

The Company's arguments focus on the dust restriction; with respect to the exertion requirement the Company makes only cursory and unsupported allegations that it is "not feasible" to assign the occasional job requiring heavy exertion to another crew member. With respect to the dust restriction, the Company reads into it a judgment that Ackerman cannot safely perform duties involving dust, i.e. that doing so would pose a substantial risk of injury to her.

■ In support of that argument, defendant relies primarily upon the affidavit of Dr. Andrew B. Newman.[10] Dr. Newman concludes that to have returned plaintiff to work as an installer in 1982 would have posed a substantial and imminent threat to her health and safety by provoking further asthma attacks and causing additional damage to her lungs. This conclusion is based on (1) an examination of plaintiff's medical file and records, (2) his familiarity with industrial type respirators, and (3) his interpretation of the work restriction to "stay away from dust."

Dr. Newman's conclusory statement is insufficient as a matter of law to meet the stringent requirements of the safety defense. First, both Dr. Kamal Shamash, plaintiff's treating physician, and Dr. Carl Koerper, the Company's own Medical Director, released plaintiff to return to her job as installer in 1982 on the basis of the

---

**9.** A third defense, pertaining to the safety of others, is inapplicable in this case.

**10.** Dr. Newman's affidavit apparently is also being offered in support of a purported affirmative defense to the effect that, contrary to the medical release, plaintiff remained totally disabled. Aside from the fact that the Act does not provide such a defense, Dr. Newman's affidavit does not raise a genuine issue, first, because it does not support this purported defense and, second, because Dr. Newman never examined plaintiff.

same medical files and records, reinforced by personal examination and observation. Their opinion is backed by that of Dr. Ronald B. Elkin, a consultant who examined plaintiff and reviewed her files and records, and Dr. Jerome Sands, an Associate Medical Director of Western Electric at the time of Ackerman's termination. Dr. Newman, who has not examined plaintiff, does not question these actions but simply opines that plaintiff continued to suffer from asthma and obstructive lung disease in 1982.

Second, in noting his reservations about the use of respirators, Dr. Newman appears to focus primarily on the use of mechanical respirators and does not specifically address the use of a simple paper face mask. In returning plaintiff to work, Dr. Koerper contemplated the occasional use of such a paper mask to reduce the quantity of dust intake.[11] Such use of paper masks by Company employees is not extraordinary and there is no evidence that it would be harmful to plaintiff.

Third, Dr. Newman's rigid interpretation of the work restriction has no probative value. As Dr. Shamash, the author of the restriction, testified, he considered it an appropriate precaution to prevent aggravation of the asthma while plaintiff's response to the particular work environment was observed. He considered that options were available, such as reassigning particularly aggravating work or use of a mask when necessary, to comply with the restriction. In imposing the work restriction, he did not express a judgment that for plaintiff to return to her work as installer would

expose her to a significant risk of harm. The issue is not, as Dr. Newman puts it, whether a second doctor should be permitted to give conflicting advice, but whether informed medical judgment allows a finding of imminent and substantial danger to plaintiff's health on this record. There is no evidence that it does.

Dr. Newman's opinion lacks probative force on the safety issue for the further reason that it is based on the generalized description of installers' duties found in the Craig affidavit, not the actual record of the specific work done by plaintiff (see pp. 845 –46, *supra*).[12] Without consideration of the particulars of plaintiff's work, his opinion lacks the essential factual predicate.

Other support offered by the Company for its position is an affidavit of John S. Kazazis, an industrial hygiene engineer employed by the Company. The affidavit describes at some length the capabilities and shortcomings of respirators and states that the decision whether a respirator should be used by an asthmatic must be made by a physician. The affidavit contributes no support to the Company's position.

■ In response, plaintiff has come forward with evidence by her treating physician, Dr. Shamash, and her consulting physician, Dr. Elkin, that she could have returned to work in April 1982 with little or no risk to her health. They agree that the Company has interpreted plaintiff's work restrictions too literally. Dr. Shamash, who imposed these work restrictions, states

---

**11.** In releasing Ackerman for work on April 12, 1982, Dr. Koerper expressly noted in his examination records that Ackerman had dust masks. In light of this fact, Dr. Koerper's later testimony that plaintiff's restriction meant no work in dusty areas and that working in dusty areas with a respirator (such as a mask) would conflict with that restriction, is disingenuous at best.

**12.** It is noted that while Dr. Newman bases his opinion on claimed *familiarity* with the duties of installers, Dr. Koerper, the Company's medical director who released plaintiff to return to work, attempts to explain away that action in his affidavit by claiming *unfamiliarity* with those duties:

> I am generally familiar with the type of work done by installers. *I am not, however, familiar with the specifics of each installer work operation. In addition, there are differences between installers which are operationally significant with which I am not familiar.* As an example, I am not knowledgeable of the specifics of how an index 2 installer's duties would differ from those of an index 3, 4 or 5 installer, or the differences in skill requirements. (emphasis added)

It is, of course, those "specifics", ignored in Dr. Newman's affidavit, which are crucial to any finding in support of the safety defense.

that he was aware that there is dust in every environment, and knew that Ackerman was exposed to some dusty environments at work. He further states that his restrictions should not be interpreted to mean that Ackerman should not be allowed to work in any dusty areas or undertake any heavy exertion; while dust and exertion are common aggravating factors, each asthmatic reacts differently to various levels of exposure, and an individual might have no negative reaction to these irritants whatever. Dr. Elkin states that asthmatics should be encouraged to exercise to the limits of their tolerance; the evidence that plaintiff is currently performing duties requiring moderate exertion and exposure to dust with no apparent ill effects confirms the validity of that opinion. Moreover, Dr. Elkin states that the recommendation of appropriate masks or respirators for asthmatics is medically sound, that there is no reason to assume that the use of a respirator by Ackerman would endanger her health, and that the Company could easily determine Ackerman's individual response to a mask or respirator with no significant risk to her health.

The Company's contention that it was not required to experiment with plaintiff's work restrictions and her health to determine her individual level of tolerance must be dismissed. The law imposes on it a duty to make reasonable accommodation to plaintiff's handicap. Cal.Admin.Code tit. 2, § 7293.9. There is no evidence that the Company made any attempt even to consider possible means of accommodation to Ackerman's handicap prior to her termination, despite the fact that a Company doctor had released her for work. Its attempt to prove that no reasonable accommodation could have been made is no more than a "post-hoc explanation and attempt at rationalizing its otherwise unjustifiable [conduct]." *Department of Fair Employment and Housing v. American Airlines* ("DFEH") (1983) FEHC Dec. No. 83–15 at 50 (citing *Fadhl v. Police Department*, 553 F.Supp. 38, 42 (N.D.Cal.1982), *rev'd on other grounds*, 741 F.2d 1163 (9th Cir.1984).

As the foregoing discussion shows, the Company has offered only conclusory and speculative assertions in support of its argument that no accommodation could have been made without imminent and substantial risk to plaintiff's health. The safety defense cannot be established on the basis of such a showing, particularly when it rests on stereotypical generalizations that fail to take into account the specifics of plaintiff as an individual. *Sterling Transit*, 121 Cal.App.3d at 799, 175 Cal.Rptr. 548; *see also American National Insurance Co. v. FEHC*, 32 Cal.3d 603, 651 P.2d 1151, 186 Cal.Rptr. 345 (1982); *Johnson v. Civil Service Comm'n*, 153 Cal.App.3d at 587, 200 Cal.Rptr. 289; *DFEH v. City and Civil Service Comm'n of San Jose (Jiminez)* (1984) FEHC Dec. No. 84–18 at 15; *DFEH v. City and County of San Francisco (Jones)* (1982) FEHC Dec. No. 82–25 at 8–9; *DFEP v. Interstate Brands Corp.* (1979) FEHC Dec. No. 78–05 at 16. In *Sterling Transit*, the plaintiff was employed as a truck driver by a company that maintained an absolute rule against hiring applicants with back conditions, even those not presently disabling. Although the plaintiff had been employed satisfactorily for 19 months, he was discharged when a routine physical revealed that he had scoliosis, a congenital low back condition. In attempting to establish the safety defense, the defendant offered the opinions of two orthopedic specialists that scoliosis generally increases the risk of back injury to people engaged in strenuous activities. The specialists also agreed, however, that not all people would be similarly affected, and some might suffer no injury at all. The court held that the defendant's evidence showed at best only a *possibility* that the plaintiff might injure himself in the future, and concluded that "[i]n the light of the strong policy for providing equal employment opportunity, such conjecture will not justify a refusal to employ a handicapped person." *Sterling Transit*, 121 Cal.App.3d at 799, 175 Cal.Rptr. 548. Here too the Company has presented evidence that employment requiring physical exertion and exposure to dust might pose a risk of fu-

ture injury to some asthmatics and that the accommodations proposed by Ackerman may not be medically sound in all cases, but it has failed to present any evidence that with reasonable accommodation *Ackerman* could not perform *her* duties without imminent and substantial risk to her health. The Company's evidence of abstract medical generalizations regarding the mere possibility of future injury is not sufficient as a matter of law. *Sterling Transit,* 121 Cal.App.3d at 799, 175 Cal. Rptr. 548.

### 2. *Undue Hardship*

Under the regulation,

[a]ny employer or other covered entity shall make reasonable accommodation to the physical handicap of any handicapped individual if the employer or other covered entity knows of the physical handicap, unless the employer or other covered entity can demonstrate that the accommodation would impose an undue hardship. Cal.Admin.Code tit. 2, § 7293.9.

■■■■■■ The Company may defeat plaintiff's prima facie case by showing that the accommodation sought by plaintiff "would impose an undue hardship." The regulations permit the Company to prove undue hardship on the basis of "[t]he nature and cost of the accommodation involved." *Id.* § 7293.9(c)(5). The Company may consider the present cost of proposed accommodation measures, but not anticipated future costs of employment, such as medical and disability benefits or leaves of absence. *Sterling Transit,* 121 Cal.App.3d at 799, 175 Cal.Rptr. 548; *Johnson v. Civil Service Comm'n,* 153 Cal.App.3d at 590–91, 202 Cal.Rptr. 289; *DFEH v. City and Civil Service Comm'n of San Jose (Jimenez)* (1984) FEHC Dec. No. 84–18 at 19–21. An accommodation is not required when its effect is not to enable the handicapped person to perform the essential functions but to supplant the need for her. *DFEH v. City of Anaheim* (1982) FEHC Dec. No. 82–08 at 11; *see also DFEH v. Southern Pacific Transportation Co.* (1980) FEHC

Dec. No. 82–08 at 10. However, the mere fact that accommodation might involve the reassignment (even if preferential) of some duties to other employees does not alone establish undue hardship. *See DFEH v. Bay Area Rapid Transit* ("BART") (1980) FEHC Dec. No. 80–21 at 11–12; *Bart,* Order on Reconsideration, at 4a–7a.

■■■■ The burden is on the Company to come forward with evidence showing that the accommodation sought is either unduly costly or burdensome or would so restructure the position that essential functions would have to be performed by others. The Company maintains that the reassignment of particularly strenuous tasks proposed by Ackerman would be unduly burdensome in that it would require the Company to eliminate essential duties of plaintiff's job, and would impair the Company's ability to train other installers in higher index level, light-duty assignments.

■■■■ There is no evidence to support these contentions. As previously shown, ironwork and cabling, which included some strenuous tasks, accounted for no more than 12% of Ackerman's time over a three-year period as an index 2. Light-duty assignments, such as basic and complex wiring, occupied at least 75% of her work hours during the same period. Given the Court's prior conclusions, reassignment of some of the ironwork and cabling tasks to other installers to the extent necessary would not require the Company to eliminate essential functions of plaintiff's job.[13] Nor would the reassignment of these tasks supplant the need for plaintiff whose primary job duties have been light-duty wiring tasks.

Further, there is no evidence that minor work reassignments would unduly impair the Company's training program. Ackerman had been assigned a high percentage of wiring tasks before her termination without any apparent adverse impact on that program. There is absolutely no evidence that this assignment pattern re-

13. See pp. 845–47, *supra.*

flected any *de facto* accommodation to her handicap, or that her immediate superiors were even aware of her asthma prior to her disability leave. From all that appears in the record, Ackerman was assigned wiring operations to make efficient use of her skills. Since this pattern of assignments has had no apparent deleterious effects on training in the past, there is no reason to assume that a similar pattern of assignments will seriously impair the training program in the future. But even if some impairment were experienced, a company policy that subjects a qualified handicapped individual to discrimination on the basis of handicap affords no defense to liability. *See BART* (1980) FEHC Dec. No. 80–21 at 13 (duty to accommodate handicap outweighs enforcement of "no light-duty" provision in collective bargaining agreement). Accordingly the Company has failed to carry its burden of showing that the accommodation would impose undue hardship on it.

■ On undisputed facts, plaintiff has established a prima facie case of discrimination by defendant on the basis of physical handicap. Defendant has failed to produce evidence sufficient to rebut this case by demonstrating that the job would pose an imminent and substantial risk to plaintiff's health, or that the accommodation sought would constitute an undue hardship on the employer. In failing to accommodate Ackerman's handicap, therefore, the Company has violated the Act. Accordingly, plaintiff is entitled to judgment.

C. *Remedy*

■ Where unlawful discrimination is proven, the goal of the remedies under the Act is to restore plaintiff as nearly as possible to the position or status she would have enjoyed but for the defendant's wrongful conduct. Cal.Admin.Code tit. 2, § 7286.9(a); *cf. Ablemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Section 12970(a) of the Act provides:

> If the commission finds that a respondent has engaged in any unlawful practice under this part, it shall state its findings of fact and determination and shall issue and cause to be served on the parties an order requiring such respondent to cease and desist from such unlawful practice and to take such action ... as, in the judgment of the commission, will effectuate the purposes of this part, and including a requirement for report of the manner of compliance.

*Id.* The Commission is empowered to grant relief including but not limited to an award of backpay with attendant fringe benefits, reinstatement, retroactive seniority, front pay, and other forms of relief including compensatory and exemplary damages. Id.; Cal.Admin.Code tit. 2, § 7286.9; *DFEH v. Ambylou Enterprises, Inc.* (1982) FEHC Dec. No. 82–06, *writ denied.* While the Act is silent with respect to the relief available in a civil action brought under Cal.Gov.Code § 12965(b),[14] the California Supreme Court has held that the Act does not limit the relief a court may grant in a statutory action charging employment discrimination. *Commodore Home Systems, Inc. v. Superior Court,* 32 Cal.3d 211, 215, 649 P.2d 912, 914, 185 Cal.Rptr. 270, 272 (1982). "Absent a convincing statement of contrary legislative intent, we rule that, in a civil action under the [Act], all relief generally available in

---

14. Cal. Gov. Code § 12965(b) provides in part:

(b) If an accusation is not issued within 150 days after the filing of a complaint, or if the department earlier determines that no accusation will issue, the department shall promptly notify, in writing, the person claiming to be aggrieved. Such notice shall indicate that the person claiming to be aggrieved may bring a civil action under this part against the person, employer, labor organization or employment agency named in the verified complaint within one year from the date of such notice. The superior, municipal, and justice courts of the State of California shall have jurisdiction of such actions, and the aggrieved person may file in any of these courts. * * * In actions brought under this section, the court, in its discretion may award to the prevailing party reasonable attorney fees and costs except where such action is filed by a public agency or a public official, acting in an official capacity.

noncontractual actions, including punitive damages, may be obtained." *Id.* at 221, 649 P.2d 912, 185 Cal.Rptr. 270. Plaintiff seeks an award of backpay with attendant fringe benefits, reinstatement and/or front pay, compensatory damages for loss of experience and for emotional distress, and punitive damages.

### 1. *Back Pay*

Once there has been a finding of unlawful discrimination, plaintiff is entitled to be made whole for the injuries she suffered as a result. *DFEH v. Northrop Services, Inc.* (1983) FEHC Dec. No. 83–11 at 13; *DFEH v. Rayne Water Conditioning* (1982) FEHC Dec. No. 82–03 at 11–12. Accordingly, the Court in its proposed opinion of March 27, 1986, indicated its intention to award full back pay and reinstatement. In its comments and objections, the Company asserted that back pay liability was limited and reinstatement precluded by reason of a region-wide lay off on December 10, 1985, of all installers having less than ten years of service. At that time, Ackerman would have had only seven and one-half years of service.

Plaintiff has demonstrated, however, that in late 1984 and 1985, the Company made efforts to place San Francisco/Oakland based surplus installers with AT & T Communications, Inc. ("AT & T–C"), another AT & T subsidiary, pursuant to Company policy and provisions of the applicable collective bargaining agreement encouraging the retention and transfer of surplus installers to other AT & T Company organizations whenever possible.[15] The Company assisted surplus installers in seeking employment with AT & T–C by making appointments, allowing them to complete applications and take the placement tests on Company time, and aiding them in

studying for the tests. As a result, AT & T–C hired 35 Company employees in jobs requiring some of the same skills required of installers.

The Company contends that AT & T–C did not hire installers similarly situated to Ackerman. Its evidence shows that since January 1, 1983, the Company laid off 11 index 2 installers who like plaintiff had 1978 services dates. Of the index 2s who were laid off, eight took the three-part AT & T–C job placement test designed to measure learning ability, technical knowledge, and technical reading ability. On the basis of the test results, applicants were classified as "Better Qualified," "Basic Qualified" or "Not Qualified." In filling the relevant vacancies during this period, AT & T–C gave first preference to AT & T–C employees seeking to move laterally into these positions. Second preference was given to AT & T–C employees seeking promotions into these positions and to Company installer applicants. Of the candidates in the second tier, those classified as "Better Qualified" were given priority. Further, candidates with more AT & T seniority were given priority over any equally qualified candidates. Of the eight Company installer candidates who took the placement test, only one was classified as "Better Qualified" and he was the only index 2 installer with a 1978 service date hired by AT & T–C.

The Company asserts that if Ackerman had applied for AT & T–C employment and been compared with the index 2 installer hired, she would not have had priority. First, the Company asserts that it is unlikely that Ackerman would have scored as well on the placement test as the individual hired since, unlike Ackerman, he had five years of college education. Further, the

---

**15.** Company Instruction C.I. 12.500 dated March 30, 1984, provides:

Employees with proven competence and capacity for future development should be retained wherever possible. The possibility of transfer to other divisions, assignment to a subsidiary or to another Bell System Company in the same general area should be thoroughly investigated before layoff is effected.

Furthermore, the collective bargaining agreement in effect at the time of the December 1985 force reduction contains a Memorandum of Understanding which makes reference to the transfer of Installation Organization personnel to other AT & T companies.

Company asserts that even assuming Ackerman would have achieved a "Better Qualified" rating, she still would not have had priority over the index 2 selected because he had four months more seniority than Ackerman.

■ A wrongfully terminated employee is not entitled to back pay for a period when he or she would not have been on the job in any event for a reason unrelated to the unlawful conduct of the employer. *Richardson v. Restaurant Marketing Associates, Inc.*, 527 F.Supp. 690, 696 (N.D.Cal.1981). As the party seeking to limit its liability for back pay, however, the Company bears the burden of establishing by clear and convincing evidence the date on which plaintiff's employment would have terminated. *Lindsey v. RAH Industries* (1980) FEHC Dec. No. 80–12 at 10; *DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 38, 50; *DFEH v. Kingsburg Cotton Oil Co.* (1984) FEHC Dec. No. 84–30 at 35; *DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 17, 19; *cf. Gonzalez v. Markle Manufacturing Co.*, 487 F.Supp. 1088, 1092–93 (W.D.Tex.1980), *aff'd*, 614 F.2d 1083 (5th Cir.1980). Further, defendant must demonstrate that it would have terminated Ackerman rather than someone else. *DFEH v. Kingsburg Cotton Oil Co.* (1984) FEHC Dec. No. 84–30 at 33–34; *cf. Gonzalez*, 487 F.Supp. at 1093. Finally, "since the Company's unlawful conduct has created the necessity for this back pay judgment, any 'uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating party.' " *Lindsey v. RAH Industries* (1980) FEHC Dec. No. 80–12 at 10, *quoting Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir.1975); *see also DFEH v. Rayne Water Conditioning* (1982) FEHC Dec. No. 82–03 at 9 (same); *DFEH v. Northrop Services, Inc.* (1983) FEHC Dec. No. 83–11 at 13–14 (same); *cf. Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir.1974); *Mead v. U.S. Fidelity & Guaranty Co.*, 15 Empl.Prac.Dec. ¶ 7885, at 6406 (D.Minn.1976).

■ Thus, the Company bears the burden of demonstrating by clear and convincing evidence that Ackerman would not have been transferred to a position with AT & T–C or another AT & T company prior to the December 1985 lay off. It is undisputed that a number of jobs were available with AT & T companies to persons in Ackerman's position in 1985. Whether Ackerman would have been hired depended on various factors which cannot now be ascertained, including how she would have scored on the test. The Company compares Ackerman with the single index 2 who was transferred and seeks to show that he was better qualified. But the conclusion that he would have been transferred rather than Ackerman is speculative: "[g]eneralizations and guesses fall far short of [the] evidentiary proof" necessary to sustain defendant's burden. *DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 50. Moreover, defendant has limited its evidence to the transfer experience of index 2 installers with 1978 and 1979 service dates, and has compared Ackerman only to the single person hired by AT & T–C who fell within that category. Since priority was determined by service date rather than index class, and there is substantial evidence in the record that plaintiff might have been promoted to index 3 prior to the 1985 force reduction, defendant's showing does not sustain its burden. Defendant has presented no evidence with respect to the seniority and qualifications of the other 34 installers transferred to AT & T–C. The number of transfers at issue being relatively small and the relevant information being within the control of the defendant, such evidence must be presumed to have been unfavorable to the defendant's position. Because considerable uncertainty remains as to whether Ackerman would have been transferred to another AT & T company prior to the 1985 layoff, defendant has failed to meet its burden of proving the date of Ackerman's termination by clear and convincing evidence. Since, as a matter of law, all doubts are resolved against the discriminating party, the issue of back pay

termination must be resolved in favor of plaintiff. *DFEH v. RAH Industries, Inc.* (1980) FEHC. Dec. No. 80–12 at 10–11; *DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 38, 50.

Ackerman contends that in light of her extensive experience in index 3 work operations, it is reasonable to assume that she would have been promoted to index 3 by her fifth year of service. She therefore claims that back pay should be awarded at the index 3 compensation level from that time on. *See DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 50–51 (back pay award based on salary histories of other employees with similar seniority). While the Company's system of advancement and promotion relies heavily on the installer's accumulated work hours in higher index level work operations, there is no guarantee of promotion on the basis of hours worked or seniority and on this record such a promotion must be regarded as speculative for purposes of back pay computations.

■ Ackerman is therefore entitled to an award of full back pay at the index 2 compensation level, together with all raises, bonuses, and other fringe benefits (including but not limited to medical, seniority, retirement and pension benefits) she would have received absent defendant's unlawful conduct, from April 12, 1982 to the date of this order. Cal.Admin.Code tit. 2, §§ 7286.9(a)(1), 7286.9(a)(1)(A); *County of Alameda v. FEHC*, 153 Cal.App.3d 499, 508–509, 200 Cal.Rptr. 381, 386 (1984); *DFEH v. Northrop Services, Inc.* (1983) FEHC Dec. No. 83–11 at 13; *DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 51–52.

■ The amount of plaintiff's interim earnings, including bonuses,[16] shall be deducted from the back pay award. Cal. Admin.Code tit. 2, § 7286.9(a)(1)(A); *DFEH v. Northrop Services, Inc.* (1983) FEHC

Dec. No. 83–11 at 13. The award shall be further offset by the amount of Company disability benefits paid to Ackerman from April 12, 1982, to June 15, 1982, and any state disability benefits paid to her after April 12, 1982. *DFEH v. Kingsburg Cotton Oil Co.* (1984) FEHC Dec. No. 84–30 at 36; *see also DFEH v. City and County of San Francisco Municipal Railway (Jones)* (1982) FEHC Dec. No. 82–25 at 9–10 (worker's compensation disability benefits offset from back pay award). Ackerman's unemployment compensation shall not be deducted from her back pay award. Cal.Admin. Code tit. 2, § 7286.9(a)(1)(A); *County of Alameda v. FEHC*, 153 Cal.App.3d at 508, 200 Cal.Rptr. 381; *DFEH v. Kingsburg Cotton Oil Co.* (1984) FEHC Dec. No. 84–30 at 36; *DFEH v. City and County of San Francisco Municipal Railway (Jones)* (1982) FEHC Dec. No. 82–25 at 10; *cf. National Labor Relations Board v. Gullet Gin Co.*, 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951); *Kauffman v. Sidereal Corp.*, 695 F.2d 343, 346–47 (9th Cir.1982).

■ There is no reason to credit the Company with the amount of the settlement received by plaintiff from the Union. Plaintiff asserted a number of claims unrelated to handicap discrimination against the Union. The fact that a union may be required to pay a portion of damages assessed in an action for breach of a collective bargaining agreement, *cf. Bowen v. United States Postal Service*, 459 U.S. 212, 224–25, 103 S.Ct. 588, 596, 74 L.Ed.2d 402 (1983), does not compel an offset in this case for the Union's voluntary payment to compromise the claims against it.

Defendant's claim of an offset based on alleged drug use by plaintiff during her disability is, at best, frivolous and not entitled to consideration.

Interest on the award shall accrue at the rate of 10% per year, compounded annual-

---

16. Bonuses paid to Ackerman by Vector Laboratories are properly included in interim earnings. Under California law, "a bonus is not a gift or gratuity, but a sum paid for services ..." *Newburger v. Rifkind*, 28 Cal.App.3d 1070, 1073, 104

Cal.Rptr. 663, 665 (1972); *see also Di Salvo v. Chamber of Commerce*, 568 F.2d 593 (8th Cir. 1978) (deducting bonus from back pay as interim income).

ly, until the date of payment. Cal.Code Civ.Proc. § 685.010.

### 2. *Reinstatement/Front Pay*

█ Ackerman has requested reinstatement to an installer position or to an equivalent position in an AT & T company in the San Francisco Bay Area. The Court declines to order reinstatement since the record reflects that all San Francisco-based index 2 installers with less than 10 years service were laid off in the December 1985 force reduction and none have been recalled. She will be awarded layoff allowance in the amount received by other index 2's and the same right of recall afforded to other index 2's.

█ When reinstatement is not feasible, front pay may be awarded. *DFEH v. Smitty's Coffee Shop* (1984) FEHC Dec. No. 84–25 at 18 n. 1; *cf. EEOC v. Pacific Press Pub. Ass'n,* 482 F.Supp. 1291, 1320–21 (N.D.Cal.1979), *aff'd* 676 F.2d 1272 (9th Cir.1982). Front pay is an equitable remedy designed not only to compensate for lost reinstatement rights by allowing discharged employees a reasonable opportunity to find comparable employment but also to deter future improper employer action. *Pacific Press,* 482 F.Supp. at 1320–21 (citing *Burton v. Cascade School District Union High School No. 5,* 512 F.2d 850, 853 (9th Cir.), *cert. denied,* 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975) (approving award of front pay in lieu of reinstatement)). Front pay takes into account the employer's continuing obligation to make the discharged employee whole until the employee attains a level of earnings equivalent to what she enjoyed at the time of her termination. *Smitty's Coffee Shop,* (1984) FEHC Dec. No. 84–25 at 18.

█ Although the amount of front pay awarded cannot be calculated in accordance with any specific formula, several factors must be taken into account. The first is the loss of the experience and training plaintiff would have gained had she not been terminated, and the consequent loss of the opportunity to be promoted to index 3. In addition, consideration must be given

to the loss of opportunity to transfer to a position with another AT & T company, as previously discussed. Although such a transfer was not a certainty, plaintiff's discharge deprived her of the chance of obtaining it. *See Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097–98 (8th Cir.1982), and pp. 853–54, *supra.* Had she been able to remain on the job, her qualifications for a transfer to another AT & T position would clearly have improved. Finally, the damage to her employment history and career development must be considered. *DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 53–54; *DFEH v. City and Civil Service Commission of San Jose (Jimenez)* (1984) FEHC Dec. No. 84–18 at 25.

Taking these factors into account, the Court awards plaintiff front-pay for a period of three years, to be computed at the rate of net back pay payable under the back pay order.

### 3. *Compensatory Damages for Emotional Distress*

█ The evidence in support of plaintiff's claim for compensatory damages for emotional distress reflects only the sort of distress that anyone involuntarily terminated from her job can be expected to suffer. Although plaintiff claims to have felt depressed for several months from her termination until she found a new job in February 1983, she did not consult a physician, psychiatrist or psychological counselor for emotional difficulties. Aside from feeling tired, she experienced no significant physical manifestations of emotional injury. Such evidence as plaintiff has presented with respect to emotional injury is insufficient to support an award of compensatory damages and does not rise to the magnitude of distress held to be sufficient in cases in which such an award has been made. *See, e.g. DFEH v. Bee Hive Answering Service* (1984) FEHC Dec. No. 84–16; *DFEH v. Jack's Restaurant* (1984) FEHC Dec. No. 84–08; *DFEH v. Ambylon Enterprises, Inc.* (1982) FEHC Dec. No. 82–06. Furthermore, there is no evidence

that plaintiff was subjected to outrageous or abusive treatment by the Company. As hereafter discussed, the Company's actions were unfounded and extremely ill-advised, but that is not sufficient to sustain an award of compensatory damages for emotional distress, and the Court finds that such injuries as plaintiff has sustained can be adequately remedied by other forms of relief. *DFEH v. Kingsburg Cotton Oil Co.* (1984) FEHC Dec. No. 84–30 at p. 37.

### 4. *Punitive Damages*

The Court has discretion to award punitive damages under the Act "to punish or make an example of [the defendant] where [the defendant's] conduct has been particularly deliberate, egregious, or malicious." *DFEH v. Jack's Restaurant* FEHC Dec. No. 84–08 at 13; *see also DFEH v. City and County of San Francisco Municipal Railway (Jones)* (1982) FEHC Dec. No. 82–25 at 11. Plaintiff has made a strong case for punitive damages: Although in her three years of working for the Company, she had proved to be a competent and satisfactory employee, defendant discharged her, after the doctors had released her to return to work, without making any attempt to accommodate her. Furthermore, the post-hoc justification advanced by the Company in the defense of this action rests on distorted medical evidence and falls back on stereotypes.

On the other hand, it cannot be said that defendant's conduct was deliberate, egregious, or malicious or that defendant was "guilty of oppression, fraud, or malice," necessary to sustain an award of punitive damages under California law. *See Commodore Home Systems v. Superior Court,* 32 Cal.3d at 215, 649 P.2d 912, 185 Cal. Rptr. 270 (citing Cal.Civil Code § 3294(a)). Though the question is close, the Court concludes that defendant's actions having been unfounded, misguided and extremely ill-advised is not a sufficient basis for imposing punitive damages.

### 5. *Other Relief*

In addition to the relief herein granted to Ackerman, defendant shall expunge from Ackerman's permanent employment records all references (express or encoded) to Ackerman's discriminatory discharge by reason of medical disability. The Company's records shall reflect, and in response to all inquiries (verbal or written) the Company shall state that Ackerman voluntarily left the Company's employ.

Defendant is directed to submit to plaintiff and the Court a proposed judgment conforming to this opinion, accompanied by a statement reflecting the manner of calculation and the supporting data used. Defendant shall give plaintiff access to the books, records and other data necessary to confirm the accuracy of the calculations.

IT IS SO ORDERED.

### MEMORANDUM OF OPINION AND ORDER RE ATTORNEY'S FEES

Concurrently with this order, the Court has issued its final order determining that plaintiff is entitled to recover both back pay and front pay under the California Fair Housing and Employment Act, Cal.Gov. Code § 12940 ("the Act"). Plaintiff has moved for an award of attorney's fees under the Act. *Id.* § 12965(b).

### I. The Applicable Law

Inasmuch as the Court has pendent jurisdiction over plaintiff's claim under the Act, state substantive law governs the merits of that claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Van Gemert v. Boeing Co.,* 553 F.2d 812, 813 (2d Cir.1977); 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 18.04[5] (2d ed. 1986); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3561.1 at 145 (2d ed. 1984). Thus, state substantive law governs plaintiff's right to an award of attorney's fees.[1] With respect

---

**1.** *See Kabatoff v. Safeco Ins. Co.,* 627 F.2d 207, 210 (9th Cir.1980); *Schulz v. Lamb,* 591 F.2d 1268, 1272 (9th Cir.1978); *Michael-Regan Co., Inc. v. Lindell,* 527 F.2d 653, 656 (9th Cir.1975);

to civil actions, the Act provides statutory authority for an award of attorney's fees:

> In actions brought under this section, the court, in its discretion may award to the prevailing party reasonable attorney fees and costs ...

Cal.Gov.Code § 12965(b). Plaintiff is the prevailing party, and therefore she may be awarded attorney's fees and costs under California law. *Id.*

While California law clearly governs the question of whether attorney's fees may be awarded, there is uncertainty as to the law to be applied in determining the method of computing the amount of fees due. The awarding of attorney's fees by a federal court in the exercise of pendent jurisdiction raises an *Erie* issue: is the method of computing fees substantive, so that state law applies, or procedural, so that federal law applies? *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Although this issue has not been explicitly resolved, the Ninth Circuit has confronted the problem in a number of cases in the context of diversity jurisdiction. *See Shakey's Inc. v. Covalt*, 704 F.2d 426, 435–36 (9th Cir.1983); *Diamond v. John Martin Co.*, 753 F.2d 1465, 1466–68 (9th Cir.1985); *Hancock Laboratories, Inc. v. Admiral Insurance Co.*, 777 F.2d 520, 525–26 (9th Cir.1985); *see also Powell v. Old Southern Life Ins. Co.*, 780 F.2d 1265 (5th Cir.1986); *Women's Federal Sav. and Loan v. Nevada Nat'l Bank*, 623 F.Supp. 469, 470–71 (D.Nev.1985). Since the rule of *Erie* applies equally to pendent claims in the federal courts,[2] these diversity cases are apposite here.

The Ninth Circuit confronted the *Erie* problem directly in awarding attorney's fees in *Shakey's Inc. v. Covalt*, 704 F.2d 426, 435–36 (9th Cir.1983). There the district court awarded plaintiff attorney's fees pursuant to Oregon law. The defendant then challenged the manner in which the court made its award on grounds that the court failed to hold a full-scale evidentiary hearing and to discuss the *Kerr* factors. *See Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975). The Ninth Circuit held without discussion that "[t]he decision to hold an evidentiary hearing when making an attorney's fee award is a matter of procedure, and is therefore governed by federal law under the *Erie* doctrine." *Id.* at 435. Noting that the Ninth Circuit had previously affirmed attorney's fees awards supported by ample evidence without requiring a hearing, the court held that the award of attorney's fees was supported by the record and that the district court's ruling was sufficiently detailed to permit review. With respect to the *Kerr* factors, the court again noted that the Ninth Circuit had affirmed attorney fee awards on similar records, and held that the district court's opinion adequately referred to the *Kerr* factors. Finally, the court concluded that the district court's opinion survived review under either the abuse of discretion standard if federal law applied, or the clearly erroneous standard which would otherwise apply because Oregon law treats the determination of attorney's fees as a question of fact. *See Kabatoff v. Safeco Insurance Co.*, 627 F.2d 207, 210 (9th Cir. 1980).

Despite the ambiguity raised by the court's reference to to an alternate standard of review, the Ninth Circuit in *Shakey's* appears to hold that under the *Erie* doctrine federal law governs the determination of the amount of attorney's fees to be

---

*Swallow Ranches, Inc. v. Bidart*, 525 F.2d 995, 999 (9th Cir.1975). While these cases were decided in the context of diversity jurisdiction, the principle enunciated applies equally in the context of pendent jurisdiction. *See* cases cited *infra* note 2.

2. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956) ("[T]he Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law."); *Chavez v. Southern Pacific Transp. Co.*, 413 F.Supp. 1203, 1205 (E.D. Cal.1976); 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4515 (1982); *see also System Operations v. Scientific Games Dev. Corp.*, 555 F.2d 1131, 1136 (3d Cir.1977) (choice of law); *Cutler v. Bank of America*, 441 F.Supp. 863, 864–65 (N.D.Cal.1977) (same).

awarded by a federal court pursuant to state law. The Fifth Circuit recently interpreted *Shakey's* as so holding in *Powell v. Old Southern Life Ins. Co.,* 780 F.2d 1265, 1267 (5th Cir.1986). There the defendant attacked the amount of an attorney's fee award as excessive. The district court had followed Louisiana law in determining the amount of the award, and therefore had required no evidence of the kind necessary to support an award in the Fifth Circuit. The *Powell* court declined to resolve the *Erie* issue as it had not been raised by the parties below, but observed in dictum that

> in *Shakey's Inc. v. Covalt,* the Ninth Circuit Court of Appeals held that, under the *Erie* doctrine, federal law, not state law, determines the method of computing the amount of attorney fees due, even though the right to fees is based on state law.

*Id.* at 1267. This interpretation of *Shakey's* finds indirect support in other cases. *See People of Sioux County v. National Surety Co.,* 276 U.S. 238, 243–44, 48 S.Ct. 239, 241, 72 L.Ed. 547 (1928) ("Since the right exists [to tax attorney's fees as costs, a procedure available only in state court], the federal courts may follow their own appropriate procedure for its enforcement by including the amount of the fee in the judgment."); *Woods Construction Co. v. Atlas Chemical Industries, Inc.,* 337 F.2d 888 (10th Cir.1964) (subjecting fee award made pursuant to state law to federal local rules of court regarding timeliness and manner of fee application); *Kellems v. California CIO Council,* 6 F.R.D. 358 (N.D. Cal.1946) (district court not bound to enforce state statutory right to fee award to its fullest extent). *See generally* 6 J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice* ¶ 54.77[2] at 1712–13 & n. 25 (2d ed. 1986 & J. Lucas ed. Supp. 1985–86).

A subsequent panel of the Ninth Circuit, however, apparently parted company with this view of *Shakey's.* In *Hancock Laboratories, Inc. v. Admiral Insurance Co.,* 777 F.2d 520, 525–26 (9th Cir.1985), a diversity action in which the parties agreed that defendant was liable to plaintiff for attorney's fees under applicable state law, the defendant challenged the manner in which the district court made its fee award and attacked the amount of the fee award as manifestly unreasonable. The panel correctly cited *Shakey's* for the proposition that "[s]tate law governs whether there should be an award of attorney's fees in diversity actions." Inexplicably, however, and without discussion of the *Erie* issue, the panel then applied state law to determine whether the amount of the fee award was reasonable. *Id.* at 526 (Reed, J., sitting by designation).[3] Having cited *Shakey's,* the *Hancock* panel was obviously aware of its import with respect to the *Erie* doctrine, but nonetheless accepted state law as governing a federal court's calculation of the amount of an attorney's fee award made pursuant to state law.[4]

---

**3.** The court explicated the governing law as follows:

> The trier of fact in California may determine what is a reasonable amount to be allowed as attorneys' fees without hearing any testimony and without making any specific findings.... Judges may rely on their own knowledge and experience to know reasonable attorneys' fees.... The major factors considered by California courts in determining the reasonableness of attorneys' fees are the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, the attorney's learning, age and experience in the particular type of work demanded; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the cause, and the time consumed.... The determination of what constitutes reasonable attorneys' fees is committed to the sound discretion of the trial court, and an appellate court (in California) will interfere with that determination only where there has been a manifest abuse of discretion....

777 F.2d at 526 n. 12 (citations omitted).

**4.** In a roughly contemporaneous district court opinion, *Women's Fed. Sav. and Loan v. Nevada Nat'l Bank,* 623 F.Supp. 469, 470–71 (D.Nev. 1985), Judge Reed took the same approach, but finding a paucity of Nevada precedent as to the factors to be applied in making a fee award, the court instead applied federal law to calculate a reasonable attorney's fee award. *Id.* (citing *Shakey's,* 704 F.2d 426, 435 (9th Cir.1983)).

A recent opinion by yet another Ninth Circuit panel, *Diamond v. John Martin Co.*, 753 F.2d 1465, 1466–68 (9th Cir.1985) further adds to the confusion. *Diamond* held that in a diversity action, a federal local rule governs the timeliness of attorney's fees applications, but then reviewed the determination of the amount of fees awarded solely by reference to California law, without citing *Shakey's* or acknowledging the existence of an *Erie* issue.

The confusion in the cases has undoubtedly arisen because once a judge has determined that a right to attorney's fees arises under state law, it is natural for the judge to follow state law in reviewing the manner in which fees have been calculated. Nothing in the process makes the presence of an *Erie* issue intuitively obvious, particularly because in most cases it would make little if any difference in the outcome whether state or federal law controls the calculation. The difficulty, however, with the present state of the law is that it creates a trap for the unwary trial judge whose determination—often made at the cost of many hours of judicial time—is vulnerable to reversal for failure to articulate the respective state or federal criteria. Thus, in this matter as in so many others, it is important not so much that it be decided correctly but that it be decided.

Turning then to the law governing fee awards, the federal statute authorizing awards that is most closely analogous to the California Act is the Civil Rights Attorney's Fees Award Act of 1976, 42 U.S.C. § 1988. Under both acts, the accepted method of fee determination is to calculate the lodestar and then apply a multiplier if appropriate. The court first determines the number of hours reasonably expended and then multiplies that number by a reasonable hourly billing rate to determine the lodestar or touchstone figure. That figure may then be adjusted upward or downward in consideration of various factors bearing on the determination of a reasonable fee. *See Hensley v. Eckerhart*, 461 U.S. 424, 433–47, 103 S.Ct. 1933, 1939–46, 76 L.Ed.2d 40 (1983); *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 840 (9th Cir.1982) (ap-

proving blending of lodestar and *Kerr* analysis); *Serrano v. Priest*, 20 Cal.3d 25, 48–49, 569 P.2d 1303, 1316–17, 141 Cal. Rptr. 315, 328 (1977) (hereafter *Serrano III*); *Press v. Lucky Stores, Inc.*, 34 Cal.3d 311, 321–22, 667 P.2d 704, 710–11, 193 Cal. Rptr. 900, 906–907 (1983); *Aetna Life & Casualty Co. v. City of Los Angeles*, 170 Cal.App.3d 865, 880–81, 216 Cal.Rptr. 831, 840–41 (1985), *review denied; DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 24–28.

The factors to be considered under federal and state law in determining reasonable attorney's fees are similar. Under Ninth Circuit precedent, federal courts are to consider the factors set forth in *Kerr v. Screen Extras Guild, Inc.* (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)). The *Kerr* factors are:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

526 F.2d 67, 70 (9th Cir.), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). Under California law courts consider the factors set forth in *Serrano III*, including:

(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded with employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of

view of establishing eligibility for an award. . . .

20 Cal.3d at 49, 569 P.2d 1303, 141 Cal. Rptr. 315. "The amount involved and the results obtained are also factors." *Aetna,* 170 Cal.App.3d at 881, 216 Cal.Rptr. 831 (citing *Glendora Redevelopment Agency v. Demeter,* 155 Cal.App.3d 465, 474–476, 202 Cal.Rptr. 389, 395–97 (1984)). Thus, the *Serrano III* factors are largely subsumed within the list of *Kerr* factors. While the *Serrano III* factors apply exclusively to the determination of the multiplier, the *Kerr* factors are more inclusive and some will be encompassed in the determination of reasonable hours and reasonable rates. The factors are not to be applied inflexibly, *Moore,* 682 F.2d at 639; *Mandel v. Lackner,* 92 Cal.App.3d 747, 761, 155 Cal.Rptr. 269, 278 (1979), and although the trial court must indicate that it has considered the relevant factors, the court need only discuss those that are "called into question by the case at hand." *Stanford Daily v. Zurcher,* 64 F.R.D. 680, 682 (N.D. Cal.1974), *aff'd,* 550 F.2d 464 (9th Cir.1977), *rev'd on other grounds,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *Mandel,* 92 Cal.App.3d at 761,[5] 155 Cal.Rptr. 269.

It thus appears that there is no significant difference between state and federal law governing the determination computation of fees in this case.[6] Having made that determination, however, the Court will take into account both state and federal authorities.

## II. The Fee Calculation

### A. *The Lodestar*

### 1. *Hours Reasonably Expended*

As the first step in the calculation of the lodestar, the Court should determine the number of hours reasonably expended in this litigation:

> The starting point of every fee award, once it is recognized that the court's role in equity is to provide just compensation for the attorney, must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.

*Serrano III,* 20 Cal.3d at 48 n. 23, 569 P.2d 1303, 141 Cal.Rptr. 315 (quoting *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir.1974)).

#### a. *Apportionment*

In the exercise of pendent jurisdiction, this Court has statutory authority under California law to award reasonable attorney's fees for hours reasonably expended on the prosecution of the claim on which plaintiff prevailed. That claim is but one of nine originally asserted by plaintiff.

*See Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

---

5. The growing confusion surrounding the application of the factors under *Kerr* and *Johnson* has been somewhat eased by the Supreme Court's decision in *Pennsylvania v. Delaware Valley Citizens Council,* — U.S. —, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), reviewing a series of recent fee decisions by the Court. As the review makes clear, the starting point in the fee analysis is the calculation of a reasonable attorney's fee by multiplying the number of hours reasonably expended in the litigation by a reasonable hourly rate. Some of the *Kerr/Johnson* factors may bear on that calculation. The second step involves the determination of whether an adjustment should be made to the lodestar. Certain other *Kerr/Johnson* factors may be relevant here. But it is clear that the validity of the fee determination no longer depends on the ritual incantation of those factors, and in some cases it may be error to apply particular factors.

6. While the approaches taken by the California and federal courts to the award of attorney's fees are generally similar, they may differ in certain respects. For example, in *DFEH v. Cairo,* the California Fair Employment and Housing Commission ("CFEHC") expressed the opinion that the view of the lodestar and multiplier approach taken by the United States Supreme Court in *Blum v. Stenson* "may ultimately prove more restrictive than the approach taken by the California Supreme Court in *Serrano III* . . . and lower federal courts." *DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 25 n. 8. The Commission therefore declined to follow *Blum* to the extent that it restricts the approach taken under California law. See the discussion *infra* at p. 851.

Two claims were settled and dismissed by plaintiff, and six of the remaining seven were dismissed by the Court. Therefore, the Court must determine the number of hours expended in the litigating plaintiff's claim under the Act as opposed to her other claims. Not all of the hours expended in this litigation are readily allocable; some are attributable to work related to the prosecution of more than one claim, such as, in particular, some of the hours expended on depositions. Nevertheless an effort will be made to eliminate from the claim those hours not attributable to the claim under the Act. *Cf. Hensley v. Eckerhart,* 461 U.S. at 434–37, 103 S.Ct. at 1939–41.

### b. *Reasonableness*

▮ Further, only hours found to have been reasonably expended may be allowed. Plaintiff is not entitled to an award of attorney's fees for hours which were duplicative, unproductive, excessive or otherwise unnecessary. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40; *DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 25. A fee applicant must exercise "billing judgment" in the preparation of the attorney's fee application; "[h]ours not properly billed to one's *client* are not properly billed to one's *adversary* pursuant to statutory authority." *Copeland v. Marshall,* 641 F.2d 880, 891 (1980) (en banc) (emphasis in original), *quoted in Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940.

### c. *Documentation*

▮ The fee applicant also bears the burden of proving her entitlement to a reasonable amount of attorney's fees. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The documentation submitted should be sufficient to satisfy the court, or indeed a client, that the hours expended were actual, nonduplicative and reasonable, *see Jordan v. United States Dept. of Justice,* 89 F.R.D. 537, 541 (D.D.C.1981), *rev'd on other grounds,* 691 F.2d 514, 525 (D.C.Cir.1982), and to apprise the court of the nature of

the activity and the claim on which the hours were spent. *See Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *Wehr v. Burroughs Corp.,* 477 F.Supp. 1012, 1016–18 (E.D.Pa.1979). Where the documentation is deficient the court may reduce any award accordingly. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939; *Lockheed Minority Solidarity Coalition v. Lockheed Missiles and Space Co., Inc.,* 406 F.Supp. 828, 831–32 (N.D.Cal.1976) (citing *Johnson v. Georgia Highway Express, Inc.*).

Documentation in support of the fee application was submitted by plaintiff's counsel, Madeleine Tress, a solo practitioner. Late in the course of this litigation she associated Lovell Welsh Bonnie to provide contract services in legal research and drafting. Both attorneys submitted declarations and defendant submitted additional materials obtained through discovery. The documentation provided by Tress is below the standard of what is minimally acceptable and has confronted the Court with intractable difficulties in calculating an award of reasonable fees.

### d. *Calculation of Reasonable Hours*

Tress initially submitted, on her behalf only, a summary of attorney's fees and costs ("hours summary") previously prepared in connection with unsuccessful settlement discussions. In an accompanying declaration, Tress stated that the summary was "compiled primarily from contemporaneous entries made on handwritten materials" during the course of the litigation and that to the best of her knowledge it was accurate.

After discovery of Tress' contemporaneous records, defendant submitted an opposition arguing that the fee application bore no relationship to Tress' contemporaneous records. Those records evidently consisted of handwritten entries on a number of day calendars. Defendant assigned two paralegals to examine the calendars day by day and entry by entry for references to this case.[7] In contrast to the 482 entries includ-

---

7. Defendant explained that "[i]n calculating the number of time entries in plaintiff's contempo-

raneous records, defendant counted all entries

ed in the hours summary, the paralegals found only 52 contemporaneous references to this case, and, of these, only seven matched up with corresponding entries in the hours summary. Defendant therefore argues that Tress' failure to maintain contemporaneous time records merits a total denial of any fee award, or at least a 60% reduction in the number of hours claimed. Defendant also argues that further reductions are necessary to apportion the hours claimed between the Act and non-Act claims, and that Tress' failure to provide any means of distinguishing between hours expended on the various claims merits drastic across-the-board percentage reductions.

Confronted with these alleged deficiencies in the fee application, Tress submitted a reply brief and additional evidence. The reply, however, failed to refute defendant's objections. Tress asserted that defendant's "survey" finding only 52 contemporaneous entries was inaccurate since defendant counted only those entries referring to the case by name or abbreviation and stating the amount of time spent. Tress argued that she was in a better position to know which entries actually referred to this case. Counting every entry listing an event in this case, Tress herself found only 301 contemporaneous entries allegedly corresponding to 388 date entries [8] in the hours summary. Thus, in her reply, Tress concedes that her contemporaneous records are not in accord with the fee application. More importantly, Tress failed to provide a summary or listing of the 301 contemporaneous entries she claims she did find, or an explanation of how these entries correspond to the 388 separate date entries in the hours summary. Therefore, Tress has failed to inform the Court of the number of

hours and the types of activity supported by contemporaneous records.

Furthermore, the Court's own survey of Tress' contemporaneous records indicates that these records bear little or no relation to Tress' summary of hours. In some instances the contemporaneous records support a claim for substantial hours not included in the hours summary; in other instances, the hours claimed in the summary are not supported by the contemporaneous records. Thus, it cannot be found that the contemporaneous records are clearly or accurately related to the summary. At best, that summary is only a reconstruction of hours actually expended in this litigation.

■ In the absence of contemporaneous time records, the court in its discretion may deny an award of attorney's fees. *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939; *Lockheed Minority Solidarity Coalition,* 406 F.Supp. at 831–32; Cal.Gov.Code § 12965(b) (award of attorney's fees discretionary). Denial is not mandatory, however. While other circuits require that attorney's fees applicants submit detailed, contemporaneous time records,[9] the Ninth Circuit requires only that the affidavits be sufficient to enable the court to consider all the factors necessary to determine a reasonable attorney's fee award. *Williams v. Alioto,* 625 F.2d 845, 849 (9th Cir.1980), *cert. denied,* 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); *Dennis v. Chang,* 611 F.2d 1302, 1308–09 (9th Cir.1980). California law is in accord with the Ninth Circuit view. *Martino v. Denevi,* 182 Cal. App.3d 553, 558–59, 227 Cal.Rptr. 354, 357–58 (1986) (rejecting federal precedent requiring submission of detailed, contemporaneous time records), *review denied.* Further, it is generally recognized that "deficiencies in documentation are cause for re-

which identified this case by name, or abbreviation, and set forth an entry for time spent."

8. Defendant's count of 482 entries in the hours summary apparently includes each separate line entry. In some cases entries of more than one line appear for a single day. Plaintiff's tally of 388 entries counts each date as a separate entry.

9. *See, e.g., Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984); *Ramos v. Lamm,* 713 F.2d 546, 533 (10th Cir.1983); *New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1148 (2d Cir.1983); *National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982).

duction rather than outright denial of fees." *Action on Smoking and Health v. C.A.B.,* 724 F.2d 211, 220 (D.C.Cir.1984) (citing *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939); *Miller ex rel. NLRB v. Hotel and Restaurant Employees and Bartenders Union, Local 2,* 107 F.R.D. 231, 245 (N.D. Cal.1985) (same); *cf. In re Equity Funding Corp of America Securities Litigation,* 438 F.Supp. 1303, 1328 (C.D.Cal.1977) (reduction of hours for inadequate documentation required).

██ The Court concludes that the fee application, viewed in light of all the circumstances of this case, is sufficient to enable the Court to determine a reasonable attorney's fee, *see Dennis v. Chang,* 611 F.2d at 308–09; *Martino v. Denevi,* 182 Cal.App.3d at 569, 227 Cal.Rptr. 354, and that the deficiencies in documentation warrant reduction rather than denial of fees. The application submitted and the Court's own observation confirm that plaintiff's counsel has expended a substantial amount of time in this litigation, much of which accounted for by the difficult legal and evidentiary problems raised, as well as the obdurate opposition of defendant. Further, denial of attorney's fees in this case, even though justified by counsel's indifference and neglect, would frustrate the remedial purposes of the Act and work a substantial injustice on plaintiff. *See DFEH v. American Airlines* (1983) FEHC Dec. No. 83–15 at 58. In the absence of a fee award, plaintiff would be obligated to pay 40% of any monetary relief obtained to her counsel pursuant to a contingency fee agreement. It would be inequitable to penalize plaintiff for her counsel's failure to maintain adequate documentation. Accordingly, attorney's fees will be awarded to plaintiff as hereafter calculated, but the award will be conditioned on a waiver by plaintiff's counsel of their rights under the contingency fee arrangement.

Having determined that an attorney's fee award is warranted, the Court must determine the number of hours reasonably expended. The Court may do so either by reviewing the contemporaneous records, or by treating the fee application as an independent reconstruction of hours expended.

### i. Reviewing the Contemporaneous Records

Defendant has submitted to the Court photocopies of the relevant pages of Tress' day calendars from 1982 to the present. Since Tress used more than one calendar in most years, the records are voluminous and contain references not only to this case, but to Tress' other professional and personal activities. They are largely incomprehensible to the uninitiated outsider and afford no basis for a calculation by the Court of hours expended on the claim.[10] The burden of culling an accurate hours summary from contemporaneous records properly rests with the fee applicant, not the Court. *See In re Equity Funding Corp.,* 438 F.Supp. at 1327. That burden has not been met.

### ii. Reconstruction of Hours Expended

██ Alternatively, the Court may treat the fee application as a reconstruction of the hours actually expended. In the absence of contemporaneous records, reconstruction may be used as a basis for an award of attorney's fees. *See City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102–1103 (2d Cir.1977); *United States v. State of Washington,* 626 F.Supp. 1405, 1446, 1516 (W.D.Wash.1985). In reviewing reconstructed records, the Court must "subject the retrospectively created record to a more exacting scrutiny than [it] would bring to contemporaneous and detailed

---

**10.** Plaintiff was on notice of the necessity of maintaining adequate contemporary records from Local Rule 270–2 requiring that fee applications shall be supported by

A statement of the services rendered by each person for whose services fees are claimed together with a summary of the time spent by each person, and a statement de-

scribing the manner in which time records were maintained. Depending on the circumstances, the judge may require submission of the abstract of the contemporary time records or the production of these records for inspection, including in camera inspection, as the judge deems appropriate.

records." *Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 952 (1st Cir.1984). As with contemporaneous records, however, hours claimed in a reconstructed time summary are taken at face value, and are then reduced where necessary to apportion the time spent between successful and unsuccessful claims, to eliminate hours not reasonably expended, and to account for lack of adequate documentation, such as vague or cryptic work descriptions. In doing so, the Court may attempt to identify specific hours to be eliminated, or simply reduce the hours claimed. *See Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941.

In its opposition, defendant essentially treats Tress' hours summary as a reconstruction and argues that the total number of hours claimed—1611 hours—should be subject to substantial across the board percentage reductions, first to apportion the time spent between plaintiff's Act and non-Act claims, and then again to account for lack of adequate contemporaneous documentation and alleged "unreliability and non-objectivity" of the hours summary.

By the application of a mathematical formula,[11] defendant calculated that 570.68 hours, or 37% of the hours claimed, could fairly be apportioned to the Act claim. Defendant contends that the manifest unreasonableness of the total hours claimed and the lack of contemporaneous documentation constitute an "egregious" failure of proof requiring total disallowance of the hours claimed. *See Grendel's Den, Inc. v. Larkin,* 749 F.2d at 952. In the alternative, however, defendant seeks a 60% reduction of the 570.68 hours apportioned to the Act claim. After that reduction, defendant submits that an award could fairly be made for 228.4 hours. Defendant then applied a rate of $85 per hour to arrive at a suggested lodestar for Tress of $19,414.

Applying a similar formula to the hours claimed by Bonnie, defendant maintains that she may be fairly compensated for 60.5 hours at a rate of $60 per hour for a total of $3,630. Thus, defendant concedes that a reasonable fee award in this action for plaintiff's counsel, Tress, and her associate, Bonnie, would be $23,044.

The percentage reduction method used by defendant to determine the number of hours reasonably expended has been employed by a number of courts, especially when contemporaneous records are seriously deficient or nonexistent. *Action on Smoking,* 724 F.2d at 220; *Grogg v. General Motors Corp.,* 612 F.Supp. 1375, 1380 (D.C.N.Y.1985). In *Hensley,* however, the United States Supreme Court questioned this method of determining the number of compensable hours, saying:

> We agree with the District Court's rejection of a "mathematical approach comparing the total number of issues in the case with those actually prevailed upon." ... Such a ratio provides little aid in determining what is a reasonable fee in light of all the relevant factors.

*Hensley,* 461 U.S. at 436 n. 11, 103 S.Ct. at 1940–41, n. 11.

An alternative method is to estimate from all available evidence the number of hours reasonably expended in pursuit of the successful claim. As stated by the court in *Wehr v. Burroughs Corp.:*

> [W]e are required to examine the documentation which has been submitted and make whatever reasonable determinations are possible. Although these "educated guesses" may lack ... exactitude ... we do not believe that petitioners can validly object since their failure to provide complete, detailed documentation is the direct cause of that inexactitude. Furthermore, we believe that estimates,

---

11. Defendant recognized that plaintiff's counsel was entitled to compensation for the proportion of her time spent on plaintiff's claim under the Act, and further recognized a 25% overlap with the breach of contract claim and another 25% overlap with the breach of covenant of good faith and fair dealing claim. Thus, in the apportionment defendant used a factor of 1.5 (1.0, plus .25 plus .25) divided by the number of claims plaintiff was prosecuting during specific portions of the litigation. Defendant's calculations were based on the total of 1530 hours claimed in the hours summary, and did not include the additional 81 hours claimed in plaintiff's reply brief.

no matter how inexact, based upon documentary evidence are preferable to … "across-the-board" percentage reductions …

477 F.Supp. 1012, 1017 (E.D.Pa.1979).

■ Accordingly, the Court has painstakingly scrutinized Tress' summary of hours in the light of defendant's objections and finds that 310 hours can be reasonably identified as having been spent on the prosecution of the claim under the Act. An additional 75 hours expended on general litigation activities may fairly be apportioned to this claim. The hours expended in the prosecution of this claim, together with the hours apportioned to the claim, therefore total 385 hours.

This figure, however, includes 47 hours expended in reviewing the previously prepared fee application and in preparing plaintiff's reply brief on attorney's fees. While attorney's fees are ordinarily awarded for hours expended in preparing the attorney's fee application, see Serrano v. Unruh (Serrano IV), 32 Cal.3d 621, 626–39, 652 P.2d 985, 186 Cal.Rptr. 754 (1982); Rosenfeld v. Southern Pacific Co., 519 F.2d 527, 530–31 (9th Cir.1975), these hours must be "reasonably expended." Hensley, 461 U.S. at 433, 103 S.Ct. at 1939. Plaintiff's counsel's fee application and reply brief were so deficient that the hours claimed for preparation of these documents cannot be considered as reasonably expended. After submission of the fee application and reply brief, the Court still had not been given an objective, reliable basis on which to determine the number of hours reasonably expended in this litigation, and therefore was forced to rely on reconstruction. The failure of plaintiff's counsel to perform in accordance with the minimum standards established by the case law and this court's Local Rules warrants the elimination of the 47 hours expended in the preparation of these documents.

In light of all the available evidence, the Court concludes that 338 hours were reasonably expended, and that the remaining hours claimed in the summary must be excluded as not reasonably expended or adequately supported.

———

■ Lovell Welsh Bonnie seeks compensation for a total of 218 hours. Bonnie was hired by Tress on April 13, 1985 to provide contract services in legal research and drafting. With minor exceptions, the hours claimed by Bonnie are fully supported by her contemporaneous records. Therefore, in determining the number of hours reasonably expended by Bonnie the Court need not resort to reconstruction and estimation.

In its opposition to Bonnie's fee application, defendant concedes that it is possible to identify a number of hours related to plaintiff's claim under the Act. Defendant excludes certain other hours for lack of adequate work descriptions, and then applies a mathematical formula to apportion the remaining hours between Act and non-Act claims. By this method, defendant concludes that Bonnie may fairly be compensated for 60 hours at a rate of $60 per hour for a total of $3,600.

After an independent review of Bonnie's hours summary and a limited examination of her contemporaneous records, the Court concludes that of the 218 hours claimed, 55 must be deducted as relating to non-Act claims, or as not supported by contemporaneous records, or as not shown to have been reasonably expended, yielding an adjusted subtotal of 163 hours. Of these, 55 hours are clearly identifiable as related to plaintiff's Act claim. Of the remaining 108 hours, 32 may fairly be apportioned to the claim. Combining the 55 identifiable hours with the 32 apportioned hours, the Court finds that 87 hours were reasonably expended by Bonnie in this litigation.

### 2. Reasonable Hourly Rates

■ A reasonable hourly rate reflects the skill and experience of the lawyer, including any relevant areas of particular expertise, and the nature of the work performed. See Hensley, 461 U.S. at 433–34, 103 S.Ct. at 1939–40; Serrano III, 20 Cal.3d at 48–49, 569 P.2d 1303, 141 Cal.

Rptr. 315; *Mandel v. Lackner,* 92 Cal. App.3d at 278, 155 Cal.Rptr. 269. The Court may consider the applicant's customary billing rates and the prevailing rate charged by attorneys of similar skill and experience for comparable legal services in the community. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984); *Moore v. Jas. H. Matthews & Co.,* 682 F.2d at 840; *Mandel v. Lackner,* 92 Cal.App.3d at 761–62, 155 Cal. Rptr. 269; *DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 25.

Tress has requested an award of attorney's fees at the rate of $125 per hour. Defendant suggests a rate of $85 per hour. Tress was admitted to the Bar in 1977. After several years as legal counsel for a corporation, she entered private practice in 1982. Tress has had little trial experience but holds herself out as having some expertise in employment and discrimination matters. Her charges to her clients since 1982 have ranged from $70 to $100 per hour. The issues presented in this case have been novel and complex, both legally and factually. Tress' performance, however, has been erratic (even allowing for a brief illness) and at times below the standard for experienced lawyers. The Court finds that an hourly rate of $95 is reasonable.

Bonnie has requested attorney's fees at the rate of $75 per hour. Defendant contends that $60 per hour would be a reasonable rate. Bonnie was admitted to the Bar in 1975. After several years as legal counsel to local government agencies, Bonnie entered private practice in 1983, and now apparently provides contract legal services to other attorneys. Although Bonnie does not state her customary billing rates, she contends that the prevailing rates for legal work on employment discrimination in San Francisco range from $75 to $165 per hour or more. The Court finds that Bonnie's qualifications and responsibilities in this action were equivalent to those of an associate in a law firm and that $75 per hour represents a reasonable hourly rate for her services.

### 3. *Calculation of the Lodestar*

The lodestar is the product of reasonable hours and reasonable rates, and represents an objective basis for an initial determination of an award of attorney's fees. For 338 hours at the rate of $95 per hour, Tress is entitled to a fee award of $32,110. For 87 hours at the rate of $75 per hour, Bonnie is entitled to an award of $6525. Combining Tress' $33,800 with Bonnie's $6525, the total lodestar figure amounts to $38,635.

Because of the difficulties inherent in the setting of fees in this case, the Court has made an independent evaluation of the value of the professional services rendered to plaintiff, having in mind the view expressed by the California Supreme Court that

[t]he experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.

*Serrano III,* 20 Cal.3d at 49, 569 P.2d 1303, 141 Cal.Rptr. 315 (quoting *Harrison v. Bloomfield Building Industries, Inc.,* 435 F.2d 1192, 1196 (6th Cir.1970) ).

The Court has been actively involved in this litigation for one and one half years. It is familiar with the pleadings, the discovery activity and the proceedings on the motion for summary judgment. The Court, of course, is also familiar with the issues, the evidence, the amounts at stake, the quality of the lawyers' work, the conduct of the parties, and the outcome. Based upon its knowledge of this litigation and its general experience, the Court finds that $38,635 is a reasonable fee for plaintiff's counsel.[12]

12. The Court is aware that considering the anticipated amount of plaintiff's monetary recovery (approximately $60,000) and the quality of her counsel's work, this award is on the high end of the range of reasonableness. In reaching its conclusion, however, the Court has also tak-

## B. *Adjustments to the Lodestar*

■ Having calculated the lodestar figure as an objective basis for the award of attorney's fees, the Court may make upward or downward adjustments in consideration of the results obtained and various other factors set forth in *Kerr* and *Serrano III*. *Hensley*, 461 U.S. at 434 & n. 9, 103 S.Ct. at 1940 & n. 9; *Serrano III*, 20 Cal.3d at 48–49, 569 P.2d 1303, 141 Cal. Rptr. 315. A number of factors militate toward an upward adjustment. This case presented novel and complex issues in the relatively undeveloped law of handicap discrimination. Further, in obtaining back and front pay plaintiff obtained in substantial measure the results she sought, and in so doing established points of law which will inure to the benefit of other handicapped individuals in California. The demands of this litigation probably precluded Tress from accepting some other employment. A fee award was highly contingent in that, beyond the realm of the CFEHC, California law on handicap discrimination was largely uncharted, and plaintiff faced formidable evidentiary obstacles in establishing her case. The risk in seeking compensatory and punitive damages has been borne out by this Court's denial of such damages.

These factors, however, are outweighed by the quality of plaintiff's counsel's performance which does not merit an upward adjustment of the fee. Her efforts may have proved adequate to obtain relief for plaintiff on one of her claims but they have not been exemplary. Counsel's organization, management and presentation of her case left much to be desired.

While the CFEHC has declined to follow *Blum v. Stenson* to the extent that it restricts the view of the multiplier expressed in *Serrano III, (see DFEH v. Cairo* (1984) FEHC Dec. No. 84–04 at 25 n. 8), the Court considers the *Blum* standard to be appropriate here and discerns no compelling reason why it should not be applied on the facts of this case. In *Blum*, the United States Supreme Court held that the product of reasonable hours times a reasonable rate is presumed to be the reasonable fee award. Noting that many of the factors considered to augment or reduce a fee award are fully subsumed within the calculation of reasonable hours and reasonable rates, the Court held that upward adjustment of the fee award is justified

> only in the rare case where the fee applicant offers specific evidence to show that the quality of service rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional."

465 U.S. at 899, 104 S.Ct. at 1549. This is not such a case. The result would not be different under California law because factors militating in favor of diminution would be sufficient to offset factors militating in favor of an enhancement of the award. *See Serrano III*, 20 Cal.3d at 49, 569 P.2d 1303, 141 Cal.Rptr. 315.

For the reasons stated, plaintiff is awarded attorney's fees in the amount of $32,110 for services performed by Ms. Tress and $6,525 for services performed by Ms. Bonnie. The purpose of a fee award is primarily to benefit plaintiff, not the attorneys. Hence this award is conditional upon plaintiff's counsel waiving any rights they may have to collect fees from plaintiff.

The Court will defer ruling on objections to costs until they have been taxed.

IT IS SO ORDERED.

en into account the extent to which what has at times appeared to have been an unreasonably zealous opposition has imposed added burdens of time and labor on plaintiff.